## BARTOL v. WALTON & WHANN CO. et al.

### (Circuit Court, D. Delaware. February 17, 1899.)

#### No. 169.

**1.** CORPORATIONS—CONTRACT OF SUBSCRIPTION TO STOCK—SUIT TO RESCIND FOR FRAUD.

In a suit by a stockholder for the rescission of his contract of subscription, on the ground of fraud inducing the same, the bill must set out specifically the facts which constitute the fraud relied upon.

**2.** SAME—MISREPRESENTATIONS.

To authorize the rescission of a subscription to stock, as having been induced by misrepresentations, it must be alleged and proved that there was a false statement of facts, made with a fraudulent intent, and which was relied on.

**3.** SAME.

The setting forth, in a prospectus of a corporation, of plans which would require that the whole amount of a proposed issue of preferred stock should be subscribed and paid for, is not a representation, to one subscribing to such stock, that none will be issued until it is all taken, nor of any existing fact which would invalidate the contract of subscription if all the stock is not taken; nor will an untrue statement by the officers that it is all taken, made after a subscriber's stock is issued, affect the validity of his subscription.

**4.** SAME—DISCOVERY OF FRAUD—LACHES.

A stockholder who, over two years after he became such, and after the corporation has become insolvent, brings suit for the rescission of his contract of subscription, on the ground that it was induced by fraud, must show that he acted with diligence after he discovered the fraud, and that it was such discovery, and not the failure of the enterprise, that impelled his action.

This is a suit in equity by Henry W. Bartol, individually and as trustee, against the Walton & Whann Company, a corporation, and James P. Winchester and Francis N. Buck, as receivers of said company, for the rescission of a contract of subscription to the stock of the defendant company.

Charles G. Rumford and James W. M. Newlin, for complainant.

Lewis C. Vandegrift and Arthur W. Spruance, for defendants.

DALLAS, Circuit Judge. On June 27, 1892, the complainant purchased, in his own right, 100 shares, and, as trustee, 10 shares, of the preferred stock of the Walton & Whann Company, a Delaware corporation, party defendant. About three months prior to this purchase a prospectus had been issued by a firm of bankers, who were the agents of the Walton & Whann Company in that behalf. The bill charges that:

"This prospectus, for the purpose of fraudulently inducing your orator and others to buy the preferred stock of the Walton & Whann Company, made certain material representations as to the financial condition of the Walton & Whann Company, which your orator has since discovered to have been false, and which he charges were then known by the officers of said Walton & Whann Company to be false."

It further charges that:

"The plan outlined by the said prospectus required that the whole contemplated issue of preferred stock, viz. $300,000, should, in good faith, be subscribed and paid for before any of it would be issued to purchasers thereof, and your orator subscribed for and paid for said stock in reliance upon

his belief that thereby the said company would, simultaneously with his sub-
scription, receive new cash capital amounting to $300,000; and this considera-
tion, together with the alleged financial condition of said Walton & Whann
Company, set forth in said prospectus of March 24, 1892, were the reasons
which induced him to purchase said one hundred and ten shares of its pre-
ferred stock."

The bill prays:

"First, that his subscriptions, individually and as trustee, for said one hun-
dred and ten shares of stock, be declared void, as having been procured by
fraud on the part of the said Walton & Whann Company; second, that your
orator individually be declared a creditor of the Walton & Whann Company
for the sum of $10,000, with interest from June 27, 1892, and that your orator,
as trustee, be declared a creditor of said company for $1,000, with interest
from June 27, 1892;" third, for process; and, fourth, for general relief.

From the preceding statement, it appears that the object of the
suit is to obtain a decree annulling the complainant's subscriptions
for the stock in question, "as having been procured by fraud," and for
restitution of the money paid by him in pursuance thereof.   The bill
is founded solely upon the ground of fraud, and such a bill must al-
ways be specific.   It is not enough to charge fraud in general terms.
The facts constituting the fraud must be stated.   Brooks v. O'Hara,
8 Fed. 529–532; Patton v. Taylor, 7 How. 132–159; Very v. Levy, 13
How. 345–361; Noonan v. Lee, 2 Black, 499–508; Voorhees v. Bone-
steel, 16 Wall. 16–29.   The pleader, in drafting this bill, did not over-
look this requirement.   He embodied in it a copy of the prospectus,
which the plaintiff avers "induced him to purchase," and it specifies
the particulars in which that prospectus is alleged to have been false,
and these specifications I will consider after some principles of law
which seem to be generally pertinent shall have been briefly ad-
verted to.   To maintain a suit for the rescission of a subscription to
stock, as having been induced by misrepresentation, it must be al-
leged and proved, not only that the representation was false, but
also that the defendant made it "knowing it to be false, or with such
conscious ignorance of its truth as to be equivalent to a falsehood."
"The scienter must not only be alleged, but proved."   Griswold v.
Gebbie, 126 Pa. St. 353–362, 17 Atl. 673.   Fraud consists in intention,
and that intention is a fact which must be pleaded, either by an ex-
press averment or by such words as necessarily imply such intent.
Moss v. Riddle, 5 Cranch, 351–357; Brooks v. O'Hara, 8 Fed. 529–532.
Fraudulent intent may, of course, be found upon proof of a false state-
ment of fact made as of the party's own knowledge, but not (if an
actual intent to deceive be not shown) where the matter stated was
only of opinion, estimate, or judgment, unless such statement was
based, by the person making it, upon his assertion of some fact which
he knew to be false, or of the truth of which he was so ignorant as
to make his assertion of it equally culpable.   In short, there must be
a false statement of fact, made with fraudulent intent, which, being
believed and acted upon, causes damage.

The bill sets forth that the financial condition of the Walton &
Whann Company was stated in the prospectus as follows:

"Statement.

"At the instance of Messrs. Elliot, Johnson & Co., Messrs. Heins & Whelen,
public accountants and auditors, of No. 508 Walnut street, Philadelphia, have

thoroughly examined the books and accounts of the Walton & Whann Co. and its associated companies. Their detailed statements can be seen at the office of Elliot, Johnson & Co., Wilmington, Delaware. Letters from most prominent banks and bankers, recommending Heins & Whelen for this purpose, can also be seen there. These statements show an excess of assets over liabilities of $412,000. Valuations of assets were tested and borne out by appraisements of the Wilmington plant by Job H. Jackson, Esq., of Jackson & Sharp Co.: Thomas H. Savery, Esq., of Pusey & Jones Co.; Alfred D. Poole, Esq., of J. Morton Poole Co.; and by bids received for the shares of the Etiwan Phosphate Company and Keystone Chemical Co.,— all of which can be examined upon application. The stockholders of the present company here agreed to guaranty the payment of all bills receivable and debts due, as carried over in the statements above referred to. No estimate of value has been made, and no charge included, for good will, patents, trade-marks, etc., which company owns. The stockholders of the present company receive, of the above capitalization, in lieu of their present holdings, all of the 4,000 ($400,000 par value) general stock, and 120 shares ($12,000 par value) of the preferred stock. The $288,000 preferred stock is issued to take up present liabilities, and, when issued, will increase the above $412,000 excess of assets over liabilities that much, or to about $700,000. "June 23, 1892. Elliot, Johnson & Co.

"Mr. Ephraim T. Walton and Mr. Francis N. Buck have agreed not to engage or become interested in the business of manufacturing or selling fertilizers, chemicals, etc., or any similar business, during the continuance of the said Walton & Whann Company, in any part of the United States in which the said company is now carrying on said business, and to serve the said Walton & Whann Co. to the best of their ability, for a term of ten years."

In the prospectus of March 24, 1892, it is further stated, viz.:

"Certificate of Earnings.

"Philadelphia, Pa., March 14, 1892.

"Messrs. Elliot, Johnson & Co., Wilmington, Del.—Gentlemen: We have examined the books and accounts of Walton & Whann Co. for the three years ending October 31, 1891, of the Etiwan Phosphate Co. for the three years ending May 31, 1891, and of the Keystone Chemical Co. of New Jersey for the three years ending December 31, 1891, and found the profits of the Walton & Whann Co., and of its interests in the said other two companies, after providing for the cost of all materials, wages, bad debts, expenses, renewal and repairs to plant and machinery, to have averaged, for the said three years, $77,436.68; and for the last year of the three, $75,466.63. Allowing a saving of interest of $20,625.00 per annum, which the proposed new capital would yield, the profits, in lieu of those above mentioned, would be: For the three years, $98,061.68; and for the last year, $96,091.63.

"Very respectfully yours, [Signed] Heins & Whelen."

It is not alleged that any misrepresentation was contained in any part of the prospectus other than that above extracted; but it is averred that this part was false in three particulars, and these enumerated particulars will now be separately dealt with, but not in the order in which they are set out in the bill.

1. It is alleged that the prospectus was false in that "the company failed to secure bona fide subscriptions for all the preferred stock"; and this allegation appears to be based upon the preceding one, "that the plan outlined by the said prospectus required that the whole contemplated issue of preferred stock, viz. $300,000, should, in good faith, be subscribed and paid for before any of it could be issued to purchasers thereof." It is not, and could not be, alleged that the prospectus expressly stated anything of this sort, and all that is asserted, it will be observed, is that the plan which it outlined required

that the whole issue should be subscribed, etc. This is not an allegation of a representation of existing fact, but, at the utmost, of a promise merely; and therefore, though, possibly, a claim of contractual liability might have been founded upon it, it certainly cannot support the charge of fraud, which is the gist of the present complaint. But it is not true that the prospectus outlined any plan from which even an agreement could be inferred that none of the preferred stock would be issued until all of it had been subscribed and paid for. It may be that such was the complainant's anticipation (he has testified that he so "understood" or "assumed"), but anticipation is one thing, and contract is another, and a very different, thing. The prospectus contains nothing whatever to indicate any mutual understanding to that effect, but, on the contrary, it refers to "all shares issued," and to "outstanding preferred shares," in a way which would be insensible if it had been intended that, until all the shares had been subscribed and paid for, no shares whatever could be issued.

In connection with the allegation that the prospectus was false, because the company failed to secure bona fide subscriptions for all the preferred stock, it is further alleged that, "in order to organize under the prospectus of March 24, 1892, and fraudulently obtain from your orator and others their subscriptions to said preferred stock, the officers of the said Walton & Whann Company issued 1,000 shares thereof, of the par value of $100,000, to themselves, although they paid nothing therefor to the company." The complainant's position is not strengthened by this supplementary allegation, or by the evidence adduced with relation to it. The averment that the transactions referred to were made in order to organize under the prospectus, and to fraudulently obtain subscriptions, is absolutely negatived by the proofs. This stock was not issued for these purposes, or for either of them, but as collateral security to enable the company to raise money upon the individual notes of its officers, and it was in fact so used, and the money thus obtained was immediately received by it. It appears that there were a number of such transactions, and that they began a few days before the complainant's subscriptions were made, and covered a period comprising several months thereafter. The prospectus says nothing about them, and, in the absence of any requirement that the stock should be all issued and paid for before any of the subscriptions thereto would be binding, the relevancy of this matter is not apparent. Whether this mode of raising money was or was not a legitimate one need not be decided. It is clear that it was not adopted with any wrongful intent or for any fraudulent object; but, even if it had been, the complainant could not be granted relief with respect thereto upon a bill charging false representations in the prospectus, and praying rescission upon that ground alone. It is true that a plaintiff may, in a proper case, be afforded relief under his general prayer, but this can be done only where the relief asked is agreeable to the case made by the bill. The court will grant such relief only as the case stated will justify, and a bill framed for one purpose cannot be made to answer another. Story, Eq. Pl. §§ 40, 42. If, therefore, the plaintiff has any separate and distinct ground of complaint respecting the issuance of these 1,000

shares, that ground cannot be considered here, because it has not been presented, and the fact that they were issued as they were has, of course, no tendency to support the unfounded allegation that the prospectus outlined a plan which required all the preferred stock to be subscribed and paid for before any of it could be issued.

Another averment, which may be appropriately considered at this point, is, in substance, that, at about the time the complainant made his subscription, it was announced by the officers of the company that the entire issue had been subscribed, and shortly thereafter it was all allotted, and thereupon a new board of directors was elected, in accordance with the plan set forth in the prospectus. There is certainly nothing in this statement, or in the accompanying allegation that "all of said preferred stock was voted at said election, and your orator supposed that all of said preferred stock had been in good faith subscribed," to entitle the complainant to the relief which he now asks. All that is here set forth seems to have occurred after he had become a stockholder, and consequently cannot be said to have induced him to do so, any more than could an occurrence arising after a sale had been completed create an implied warranty. Morris v. Fertilizer Co., 28 U. S. App. 87–92, 12 C. C. A. 34, and 64 Fed. 55. The bill states that he purchased his stock on the 27th day of June, 1892, and that the announcement of which he complains was made at "about" that time; but the proofs show that it must have been subsequently made, and the corporation's minutes disclose that the meeting and election to which the bill seems to refer, and at which the plaintiff appears to have been present by proxy, was held upon November 9, 1892, more than four months after his subscription. The "announcement" was not made or referred to in the prospectus, which is alleged to have solely influenced him, and, no matter how it may have been made, it is simply impossible that it, or any of the proceedings which ensued, could have had anything to do with his prior purchase of the stock.

2. It is alleged that the prospectus was false, in that "the profits alleged to have been made by the company for the three years ending October 1, 1891, had not been earned as alleged in said prospectus of March 24, 1892, and as to the last year, viz. that ending October 1, 1891, * * * instead of the company earning $75,-466.63 of profits, the business for that year was conducted at a loss." There is nothing in the prospectus upon which this specification can be based, other than the "Certificate of Earnings" which it contains, and the statement respecting the persons by whom that certificate was made, as follows:

"At the instance of Messrs. Elliot, Johnson & Co., Messrs. Heins & Whelen, public accountants and auditors, of No. 508 Walnut street, Philadelphia, have thoroughly examined the books and accounts of the Walton & Whann Company and its associate companies. Their detailed statements can be seen at the office of Elliot, Johnson & Co., Wilmington, Delaware. Letters from most prominent banks and bankers, recommending Heins & Whelen for this purpose, can also be seen there."

The prospectus contained no independent estimate of profits. It represented that Heins & Whelen had made a certain certificate with respect to them, and this representation was true. It, impliedly,

also asserted that this certificate was made, accepted, and presented in good faith, and there is nothing whatever in the proofs to warrant the imputation that it was not, but, on the contrary, my examination of the evidence has satisfied me, not only that the matter certified was believed to be true, but that in point of fact it was true.

3. It is alleged that the prospectus was false, in that "the alleged excess of assets over liabilities of $412,000 was the result of a fraudulent overvaluation of the assets for the purpose of selling the preferred stock." The terms of the prospectus to which this specification relates are:

"These statements [made by Heins & Whelen from the books and accounts] show an excess of assets over liabilities of $412,000. Valuations of assets were tested and borne out * * * by bids received for the shares of the Etiwan Phosphate Co. and Keystone Chemical Co., all of which can be examined upon application."

That this representation was literally true is not questioned; that statements made by Heins & Whelen did show an excess of assets over liabilities of $412,000, and bids had been received for the shares of the Etiwan Phosphate Company and Keystone Chemical Company to test and bear out their valuations. Yet, if that valuation was, as is alleged, "the result of a fraudulent overvaluation of the assets for the purpose of selling the preferred stock," the prospectus, though true in terms, was false in effect, and therefore quite as potent an instrument of deception as if it had distinctly embodied a positive misstatement, and its suggestion that the papers to which it referred could be examined upon application would not make it any less covinous. Subscribers to the stock might have examined those papers to obtain information of details, but they were not bound to look beyond the prospectus for the purpose of assuring themselves that its representations were honestly made. They had a right to believe, without inquiry, that the bids it mentioned had not been made (as the complainant charges they were) as part of a fraudulent scheme, known to the officers of the company, to overvalue its assets. But this charge has not been sustained. There is no evidence to impeach the statements made by Heins & Whelen. I am convinced that it was intended that their investigations should be made uprightly, and that the results which they reached were in fact conscientiously arrived at. Their conclusions, as the prospectus stated, were founded upon their examination of the books and accounts, and the bids which were made (as was also stated in the prospectus) were regarded as tests merely of the correctness of their deductions. Their business reputation, as well as that of the officers and of the bankers of the company, was at stake, and of this they appear to have been duly mindful. The value of the assets was a matter of judgment and opinion, and they estimated it in what was probably the only way in which it was possible to do so. They truly and plainly disclosed the method they had followed, and it has not been shown that this method was either adopted or pursued with intent to deceive, or for any fraudulent purpose whatever. Though suspicion may be aroused as to the sincerity of the offers of purchase, the evidence, as a whole, would not sustain a finding that they were,

as is averred, made and received as part of a scheme of overvaluation. Indeed, although, in the light of the present situation of affairs, the appraisement which was made of the real estate, as well as the value which was put upon the Etiwan and Keystone shares, may seem to have been excessive, yet, at that time, they might well have been supposed to be conservative and reasonable. I see no reason to doubt that they were so regarded by all of those who are now charged with complicity in a plot to cheat by means of willful and deliberate falsehood.

It is easy, in view of the subsequent failure of the Walton & Whann Company and of the large losses suffered by its creditors, to volunteer the opinion that it was insolvent when the prospectus was prepared. But the status of the corporation at that time, with the surrounding conditions, is the better test of whether there was fraud in the minds of those who issued it. An examination of the company's books, as they then were, shows, by the testimony of a disinterested accountant, that it was then financially sound, and was making large profits; and in view of these facts, and of all the evidence, it is not possible, in reason and common fairness, to say that the company or its officers had a fraudulent purpose in promulgating the valuation which the accountants placed upon its assets. I do not believe that they then supposed it to be insolvent, or in danger of insolvency; but, on the contrary, I believe that the accountants' statement was accepted in good faith, and that the insolvency which afterwards occurred was caused by a depreciation of values and other circumstances which had not been foreseen. Bank v. Rogers, 3 U. S. App. 406–413, 3 C. C. A. 666, and 53 Fed. 776. With reference to the entire case, the language adopted by the court of appeals from the opinion of the court below in Richardson v. Walton, 17 U. S. App. 525–527, 9 C. C. A. 605, and 61 Fed. 536, may be aptly quoted:

"The burden of proof is upon the plaintiff. The bill charges fraud. * * * To entitle the plaintiff to relief, the proofs should be free from all doubts and convincing. But they do not appear to be so. Taking the proofs as a whole, this much can be safely said: that the evidence is not so clear and satisfactory as to justify a decree sustaining the charge."

The subscriptions in question were made in June, 1892, and upon January 29, 1895, the plaintiff, for the first time, asserted a right and purpose to rescind. In the bill no particulars are stated to account for this procrastination. It states merely that the complainant had "since discovered" that the representations complained of were false; that, since the appointment of the receivers of the Walton & Whann Company, he had "discovered that fictitious subscriptions for $100,-000 of said preferred stock were taken"; and that after discovering this fact he elected to rescind. In my opinion, it was incumbent upon him to state with more exactness the times at which he made these discoveries, and to detail the circumstances, if any, which occasioned his failure to make them sooner. But, waiving this question of pleading, I have examined the proofs, and from them I find that the complainant received a dividend upon his stock in June, 1892, and again in April, 1893; and that upon June 13, 1893, he was

present at, and actively participated in the proceedings of, a special meeting of the stockholders, at which provision was made to borrow $40,000 upon mortgage, and a committee, consisting of the plaintiff and others, was "appointed to take into consideration the advisability of selling the interest of this company in the capital stock of the Etiwan Phosphate Company," with authority to direct the officers to make said sale; and that the plaintiff, as a witness on his own behalf, upon being asked by his counsel, "Did you afterwards discover that any statement contained in the prospectus was untrue, and, if so, in what respect, and when did you discover it?" in substance. testified, in response to this question and to several which followed, that he was told that the company was in urgent need of money; that he went to a meeting of which he could not fix the date, but which plainly appears to have been that of June 13, 1893; that this meeting was held "to consider ways and means"; that it was then and there suggested that the Etiwan property should be sold at a much lower figure than it had been taken at in valuation; that he then asked Messrs. Walton & Buck how it came that this asset, which had been represented as such a very valuable one, had suddenly become worth so much less money, and then it was that he discovered that a large amount of the preferred stock of the company had never been sold, and that the valuation of the Keystone Chemical Companies was based on a bid of Capt. Lemaister; that these were the principal matters as to which the statements contained in the prospectus were untrue and misleading; and that he purchased on the faith of the truth of the statements contained in the prospectus, which he afterwards found to be untrue by his examination of the affairs of the company within a short time after his purchase. In June, 1894, the company being then insolvent, Messrs. Winchester and Buck became its receivers, and to them the demand for rescission was made, but not until seven months after their appointment, and about one year and seven months after the stockholders' meeting of June 13, 1893.

In a case of this sort, even when clearly made out, it is the diligent only, and not the supine, that equity will relieve; and diligent this complainant certainly was not. He sought to repudiate a contract which he had made with the expectation of profit, but not until after it had become manifest that it had entailed a loss. He alleges that he was led into it by fraud, but he should have made it clear that it was the discovery of the fraud, and not the failure of the enterprise, which impelled him to retreat from it, and this he has not done. It cannot be pretended that he was prevented from examining for himself into the affairs of the company. Indeed, he has said that he did so a short time after his purchase, and then found that the statements on the faith of which he had purchased were untrue; and I am fully convinced that all that he now complains of was as well understood by him at least 18 months before as at the time he filed his bill, and certain it is that at least as far back as June, 1893, he had knowledge of facts which not only should have put him upon inquiry, but which did actually lead him to inquire; for this he has practically admitted in his testimony. It is needless to multiply citations (as might readily be done) to show that, under these circumstances, any right

of rescission, which he might otherwise have had, was lost by failure to assert that right in due season. Ogilvie v. Insurance Co., 22 How. 380–390; Wallace v. Hood, 89 Fed. 11. The learned counsel for the complainant has pressed upon my attention the case of Bank v. Newbegin, 20 C. C. A. 339, 74 Fed. 135; but the judgment in that case does not go far enough to avail the plaintiff in this one. It was there decided that recovery could be had notwithstanding the insolvency of the defendant bank; but here the obstacle to the right of the complainant to maintain his bill is not merely that the Walton & Whann Company had become insolvent before he claimed to avoid his contract, although that fact is, in my opinion, properly for consideration, in connection with the other facts, upon the question of the motive which actuated him in making that claim. Much that was said by the court in the Newbegin Case is pertinent to the present one, as tending, not to uphold, but to defeat, the complainant's contention. It was an action at law. That the plaintiff's purchase had been induced by false and fraudulent representations was conceded. The questions whether the plaintiff exercised reasonable diligence in discovering the fraud, and in electing to cancel his subscription after he had become aware that he had been defrauded, had been submitted to the jury; and this the appellate court held to have been properly done, and that the verdict on those issues was conclusive. It was said that it was "clear that the jury were entitled to determine whether the plaintiff was guilty of any want of diligence, either in discovering the fraud, or in notifying the defendant bank of his intention to rescind, or in bringing a suit for that purpose after the fraud was discovered"; and these are precisely the questions which the court has considered in the present case, and with respect to which the conclusion has been reached that the plaintiff was plainly not diligent.

The bill is defective in that it contains no offer to return the amount of the dividends which the plaintiff admittedly received upon this stock, or to submit himself to have that amount deducted from the sum for which he prays to be declared a creditor of the Walton & Whann Company. I think, however, that, as matter of form and pleading, this point need not at this stage be insisted upon; but, as matter of substance, it seems to me to be perfectly clear that a decree which, without requiring the complainant to refund the money which was paid to him upon this stock, should annul the contract under which it was acquired, would (even if otherwise proper) be manifestly inequitable and unjust. The bill will be dismissed, with costs.