## McNAUGHT v. FISHER.

(Circuit Court of Appeals, Second Circuit. July 18, 1899.)

No. 102.

1. CORPORATION—SUBSCRIPTIONS TO STOCK—PARTIES TO CONTRACT.

When a corporation is organized, and a subscription to its stock previously made is accepted, such subscription becomes a contract binding according to its terms, the parties to which are the corporation on one side and the subscriber on the other.

2. GUARANTY—CONSIDERATION.

Defendant was instrumental in procuring subscriptions to the stock of a corporation, and afterwards in its organization. The subscriptions were accepted, and the stock paid for and issued. Subsequently a subscriber, on behalf of himself and other stockholders, including plaintiff, wrote defendant in regard to certain matters relating to the corporation, and in his reply defendant stated, "I promise you that everything shall be done which is necessary to carry out the terms provided in your subscription list, and in a manner that shall be satisfactory to you." Held, that such promise, even if construed to apply to all matters contained in the subscription, and not merely to those inquired about, was without consideration as a guaranty to plaintiff, who had already paid for and received his stock, and who took no action in reliance on such promise.

In Error to the Circuit Court of the United States for the Southern District of New York.

Archibald F. Clark and James McNaught (Joseph D. Redding, on the brief), for plaintiff in error.

Arthur H. Masten and J. Snowden Marshall, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges, and THOMAS, District Judge.

THOMAS, District Judge. The true question involved in this action is whether the defendant below (the plaintiff in error), as a guarantor, is personally liable for the nonfulfillment of the terms of an agreement which the plaintiff subscribed, and pursuant to which he paid for and received the stock of a corporation afterwards formed. The plaintiff alleges a contract by the plaintiff with the defendant for the purchase of 100 full-paid, nonassessable shares of the company's stock, and an agreement in the nature of a warranty, made by the defendant with the plaintiff, that the company, when organized, should have assets in lands and money as hereafter stated. The subscription agreement signed by the plaintiff and others provided as follows:

"We, the undersigned, in consideration of the sum of one dollar by each to the other in hand paid, the receipt of which is hereby acknowledged, and the further consideration of the mutual benefits and profits expected to be realized from the investments hereinafter set forth, do agree as follows: First. We subscribe to and agree to pay for at the rate of $50 per share (par $100) the number of shares set opposite our names of the Fidalgo Island Land Company. Second. It is stipulated and agreed that the assets of the Fidalgo Island Land Co. are to consist of five hundred acres of land situated in sections 23, 26, 25, 1, 2, and 6, upon Fidalgo Island, in Skagit county, in the state of Washington, and that said island is the northern terminus of the Northern Pacific Railroad upon Puget Sound, and that at least 40% of the above five hundred acres is located in said section 23. Third. It is further stipulated and agreed that capital stock of said company shall be twelve hundred thousand dollars, of which $200,000 shall remain in the treasury of the company for a working capital, and the remainder sold to subscribers at fifty cents on the dollar, or an equivalent of a thousand dollars an acre average price for the territory owned by the company; this being the price, with ten per cent. added, at which a large portion of the above property was purchased about a year ago by a pool formed in Seattle and Tacoma. Fourth. It is further stipulated that the property in section 23 has been platted and was first placed upon the market at private sale February 3, 1891, and that the sale by lots up to date has aggregated between forty and fifty thousand dollars, and that the prices obtained have ranged from six to eight thousand dollars per acre; that the sale is steadily and regularly progressing, and that the proceeds of sales already made shall remain in the treasury of the company for the benefit of the stockholders."

This contract, until accepted by the corporation, existed only as to the subscribers thereto, but upon such acceptance the corporation became a party to it, and it became binding according to its terms. The plaintiff alleges that the company never had the stipulated assets, and the finding of the jury establishes that the terms of the subscription agreement respecting such assets were not fulfilled. An accurate statement of the dates of relevant events is of first importance. The agreement was subscribed by the plaintiff at a date not precisely obtainable, but it was after the meeting held at the Rennert House

on April 13, 1891, and before the first certificate of stock was issued to the plaintiff, on May 11, 1891. The plaintiff fixes the time in March or April, and the latter month is the probable time. The company was incorporated on the 28th day of April, 1891, in the state of Washington, for the business of buying and selling land. One McMurran, who claimed to have obtained the subscriptions at Baltimore, designated one Howard at such city to receive payment of the subscriptions, and for this purpose plaintiff delivered to Howard a check, dated May 13, 1891, payable to the order of McMurran. On May 16th, Howard sent $19,820, obtained from subscriptions, to McMurran, and the latter kept plaintiff's check for pretended commissions, and delivered the balance to the defendant, and the same was deposited to defendant's personal bank account. The defendant claims that this money, with other moneys received from subscriptions, was applied to the purchase of land, in the interest of and at the direction of the company. Under the date of May 11, 1891, the company issued in the plaintiff's name its temporary certificate No. 13 for 100 shares of its capital stock, and on May 12th intrusted the same to McMurran for delivery to the plaintiff, and McMurran caused its actual delivery to the plaintiff. After the permanent certificates had been lithographed, a second certificate, numbered 11, and dated August 22, 1891, was issued to the plaintiff, and transmitted to him through Howard, about February, 1892, and the first certificate was returned to the company.

The foregoing statement presents the salient features of the plaintiff's contract with the Fidalgo Company. It remains to consider what relation the defendant bore to the transaction that should involve personal liability on his part. This question presents three subinquiries: (1) The communications between the defendant and the plaintiff; (2) the interest of the defendant in the stock delivered to the plaintiff; (3) the defendant's connection with the money received from the subscriptions. The attention of the subscribers to the undertaking was attracted by McMurran, who, in the spring of 1891, visited Baltimore. After April 13th, and previous to the incorporation of the company on April 28th, the defendant visited Baltimore, and met several persons, who afterwards signed the subscription agreement, and explained the project, at a meeting at the Rennert House, in that city, and the defendant there made certain statements upon which some reliance is placed to prove the defendant's liability. The nature of these statements is shown by the evidence of Marshall, who at all times is prominent among the subscribers. The plaintiff was not present at the meeting. He did not at that time or on any subsequent occasion meet the defendant. Nor is there any evidence that the defendant's statement was communicated to him, or to any one acting in his behalf. There is nothing whatever in the statement made by the defendant at the Rennert House that tends to show an agreement on the part of the defendant to assure the performance of the promises contained in the agreement as to the assets of the proposed corporation. Approximating the time of the subscription, a doubt arose in the mind of Marshall as to the legal right of the corporation to issue stock according to the terms of the paper, which pro-

vided that only 50 per cent. of its nominal value should be paid therefor. Hence, Marshall wrote to and received letters from the defendant on the subject, which constituted the second item of evidence upon which the plaintiff relies. On April 9, 1891, Marshall wrote to McMurran as follows:

"In connection with the proposed subscription to the stock of the Fidalgo Island Land Company, there is a matter as to which I and a number of others would like to be fully informed. The stock is to be subscribed for and paid for at the rate of $50 per share, the par being $100. Now, while such an agreement can no doubt be made as between the company and its stockholders, it is equally certain that it is void as to creditors, who can require the full payment for the stock. If, however, the laws of Washington authorize stock subscriptions to be made in property other than money, such payment may be validly made, if the mode prescribed by law for making it be complied with. I would like to have the views of some one better informed than I am on the subject, and to know whether the stock received by the subscribers is to be so issued to them as to preclude the possibility of a claim by creditors for a further payment beyond the $50 per share. Please obtain this information for me as soon as you can."

To this letter the defendant replied under date of April 13, 1891, and the reply is addressed specifically to the inquiry of Mr. Marshall, and in it he gives attention to the legality of issuing the stock for property, and then adds:

"The price at which the lots are being sold, as Mr. McMurran has probably explained to you, is greater than the par value of the company's stock. The stock, when issued, will be issued directly to the company's grantors in payment for the lands conveyed. The stock will therefore be fully paid up and nonassessable."

If, as claimed by the plaintiff, these letters antedate the subscription by the plaintiff, they indicate no agreement on the part of the defendant with anybody. Marshall wrote for the defendant's views, and such he received. On May 13, 1891, Marshall addressed another letter to McMurran, seeking information. In it he says:

"I have just received your letter of the 12th inst., and have seen the letter of Mr. McNaught to Mr. Howard. * * * Mr. McNaught's letter says that 'arrangements' have been made 'for the balance of the subscription of $200,000.' I suppose, if the subscription had been actually made, this language would not have been used, and, as the success of the enterprise depends, according to my understanding, upon raising the entire amount, I do not care to put $10,000 in upon any contingency as to actually getting the requisite amount. I think, if I am to put up cash, I ought to know under what 'arrangements' others are to share in the venture. I will be obliged, therefore, for full information on this point. I also understood that I was to get stock that had been issued full paid to Mr. McNaught, or to some one else, and transferred to me by him. The certificate shown me is from the company directly. Please let me know fully about both these matters at your earliest convenience, and oblige."

To this letter of Marshall the defendant replied under date of May 14, 1891. In it the defendant addresses himself first to the question as to whether the entire treasury stock would be taken, and the letter continues:

"I guaranty that the subscriptions will be completed within thirty days. I, in company with T. F. Oakes, president of the Nor. Pac. R. R. Co., leave for the coast on Tuesday next, and I am anxious to close up Mr. McMurran's subscriptions before leaving. I do not know whether the record which is kept at Seattle, Washington, shows that stock to the extent of a million dollars has been issued to the persons conveying the land to the corporation, and canceled

to, the extent of the subscription of yourself and your friends. I presume, however, that everything is regular upon the record, but, if it is not, when I reach Seattle I will have the records perfected in detail. You need not have the slightest apprehension regarding a failure to secure subscriptions for the remainder of the $200,000, or the regularity of the proceedings. I promise you that everything shall be done which is necessary to carry out the terms provided in your subscription list, and in a manner that will be satisfactory to you. If you prefer to have the stock issued to some person conveying the property to the company, or a person represented by the person making such conveyance, so as to leave no doubt as to the stock being full-paid and un-assessable, kindly instruct John D. Howard to return your stock to me, and I will have it issued to such a person, and by that person transferred to you."

It appears that at this point the subject of inquiry by Marshall was the nonassessable nature of the stock, and the obtainment of subscriptions for the $200,000 of stock. But, before this letter was written, the plaintiff had signed the subscription, his subscription had been accepted by the corporation, the stock had been issued, the plaintiff had drawn and delivered his check to Howard in payment thereof, and, so far as appears, plaintiff was in possession of the stock. But from the letter of Marshall to McNaught dated May 16, 1891, it appears that the money had not been forwarded by Howard at the time McNaught's letter of May 14th was received, for Marshall writes:

"Your letter of the 14th inst. is just received, and the statements it contains are satisfactory to me. I have so stated to Mr. Howard this morning, and he will forward the money in his hands."

Subsequent letters interchanged by Marshall and the defendant show: (1) That Marshall was urged by his own solicitude, and that of other subscribers at Baltimore, to make inquiries concerning the condition of the company; (2) that Marshall and the defendant understood that the stock already issued to the subscribers should be retired, and that stock made full-paid by issuing the same for property conveyed to the company should be delivered by the party receiving such stock to the subscribers to the extent of their holdings, and that this had not been done at the date of Marshall's letter of October 10, 1891; (3) that Marshall applied to the defendant for information concerning the promised assets of the company by letters dated August 14 and October 10, 1891, and that the defendant replied thereto, but that Marshall made no claim that the defendant guarantied the fulfillment of the subscription paper in that regard. The understanding of the matter, as regards Marshall and the defendant, is summarized in the letter written by Marshall under date of October 10, 1891, and the answer of the defendant thereto by letter under date of October 13, 1891. There is one fact that admits of no doubt, namely, no letter subsequent to that of May 14, 1891, tends to show a promise on the part of the defendant to assume the fulfillment of the subscription paper as regards the stipulated assets of the corporation. It is considered that, if the warranty was made at all, it was made by the letter written by the defendant to Marshall on May 14th. That guaranty related to the fulfillment of a contract of subscription prior to that date to which the Fidalgo Company, afterwards organized, became a party, and had no prospective reference to the agreement alleged to have been made over two months thereafter between the defendant and the plaintiff for the sale of stock. It is not nec-

essary to determine the scope of the alleged warranty. Marshall wrote, making inquiries respecting the manner in which the stock should be made nonassessable, and as to the subscription for the remaining $200,000 of stock, and it was to these inquiries that the defendant's mind was directed, and to these, presumably, his letter was addressed. He uses the following language:

"I guaranty that the subscriptions will be completed within thirty days. * * * I promise you that everything shall be done which is necessary to carry out the terms provided in your subscription list, and in a manner that will be satisfactory to you."

This language, standing by itself, is sufficiently general to cover the matter of the assets of the company; but whether it does so is open to discussion, and the determination of the question is not required, inasmuch as such contract, whatever its scope, was without consideration. It did not accompany the making of the primary contract. No consideration moved the defendant for the making of such promise; nor is there any evidence that any liability was contracted on the part of the plaintiff by reason thereof. His agreement with the company had been executed on his part. He had paid the money for his subscription to Howard. The company had issued the stock. The plaintiff presumptively had the stock in his possession. In short, no liability was assumed by the plaintiff under the influence of the alleged warranty, nor was there any independent consideration for the making thereof. If the warranty was inoperative, the question whether the transfer to the company of stock by the defendant, and the issuing of the stock to the subscribers, created a sale thereof to the subscribers by the defendant, need not be determined. The warranty was not and could not be collateral to such agreement, and derived no support therefrom. There was, undoubtedly, a promise from the defendant to Marshall, at the latter's solicitation, that stock should be issued by the company for the property to be purchased by it, and that the recipient of the stock should transfer the same to the subscribers to the extent of their subscriptions. This was for the purpose of making the stock full-paid. There is evidence tending to show that the defendant received from the company stock in payment of interests claimed to have been transferred to the company, and that he surrendered some such stock to the company, and an incidental amount was afterwards issued to the subscribers. There is not the slightest evidence that he ever, upon the books of the company or otherwise, transferred stock to the subscribers. As late as October 10, 1891, Marshall complains to defendant that the arrangement has not been carried out. Therefore a sale of the stock could not have been made in August of that year, as seems to have been found by the jury, although the speculation may be indulged that the stock issued in the following year was pursuant to that arrangement. However, the question has no definite bearing upon the real fact in issue.

It is not necessary to consider whether the defendant properly and providently expended the money paid to McMurran pursuant to the terms of the subscription agreement. The money belonged to the company, and the defendant was accountable to it for the same.

There is no evidence whatever that the defendant personally appropriated it under an arrangement that it should furnish a consideration for the sale of the stock by him to the Baltimore parties, nor does it appear that the plaintiff ever had such a conception. The conclusion that the guaranty contained in the defendant's letter of May 14th was without consideration requires the reversal of the judgment, with costs.