## POSITYPE CORPORATION OF AMERICA v. MAHIN.

Circuit Court of Appeals, Second Circuit. April 8, 1929.

No. 199.

Caruthers Ewing, of New York City (Cravath, De Gersdorff, Swaine & Wood, of New York City, of counsel), for appellant.

Satterlee & Canfield, of New York City (R. Randolph Hicks, Lloyd F. Thanhouser, and Barent Ten Eyck, all of New York City, of counsel), for respondent.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. This action is for the breach of a contract to subscribe for 500 shares of the first preferred stock of the appellee corporation. Appellant agreed to pay $50,000 for this stock, which carried with it a bonus of 1,000 shares of common stock. There were 19 signers to the subscription contract, who were to receive two shares of common for one share of preferred stock, and the plan was to sell to the public one share of preferred and with it a bonus of one share of common. The sale to the public by the subscribers was to be made through their agent, a syndicate manager, at not less than $100 per unit. Sales made would reduce pro rata the liability of each participant, and, if the public sales netted a profit, this would be shared in by the subscribers. Thus each subscriber would obtain one share of common stock after having sold his preferred and one of common. In the event that the sale was unsuccessful, the subscriber was still obligated to take his stock, or so much thereof as had not been sold to the public, and payment was to be made by him in installments over a period of 11 months. The public sale was a failure, and the corporation was forced to call for the subscription from the subscribers, including the appellant, in order to carry on its business. The appellant refused to pay, and this suit resulted.

The agreement to incorporate provided for $1,000,000 of par value of first preferred, $300,000 of second preferred, and 50,000 shares of no par value common stock. An Ohio corporation, called the Positype Company, conveyed its land, factory, and equipment to the new corporation, and its stockholders received therefor $200,000 of second preferred and 2,000 shares of common stock, and for its secret rights and patents $100,000 of second preferred and 48,000 shares of common stock. Of the new corporation, 33,500 shares of common stock were held under a voting trust to give control as between certain stockholders, which is unimportant here; and, further, it provided: "All obligations under this agreement shall terminate if the underwriting of $1,000,000 shall not have been accomplished in the time and according to the terms" provided for in the "Underwriting Syndicate Agreement."

The underwriting syndicate agreement, signed by the appellant, provided for a price to the members of the syndicate of $100 a share, which included two shares of common stock; 10 per cent. of one-half of the subscription amount was payable upon the closing of the public sale, and the remaining 90 per cent. of the first half of the subscription in nine installments at 30-day intervals; the last half of the subscription not less than one month after the last 10 per cent. payment.

It was provided that "this agreement shall not be binding unless 10,000 shares of preferred and 20,000 shares of common shall have been underwritten before April 1, 1921." The appellant, upon the appellee's request, extended the time stated in the syndicate agreement to consummate the public sale of the stock which he had underwritten, and in so doing confirmed his obligation which he had contracted. The appellee was organized under the laws of the state of Delaware on June 13, 1921.

The agreement to incorporate provided: "If and when the underwriting of $1,000,000 par value of stock as provided in an attached form of 'Underwriting Syndicate Agreement' shall have been completed by the signatures thereto of responsible parties, then the parties hereto shall cause to be incorporated, a 'new corporation' having appropriate powers and a capitalization of $1,000,000 of first preferred, $300,000 of second preferred and 50,000 shares of no par common stock."

It is argued that, in view of this provision of the contract between the parties, reading the agreement to incorporate and the underwriting syndicate agreement as one contract, the appellant has created an issue for the jury as to whether the appellee obtained subscriptions of irresponsible parties and failed to carry out this provision of the contract. Instruments may be construed together to ascertain what they mean and thus obtain the intent of the parties. Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 S. Ct. 770, 33 L. Ed. 157; Id., 155 U. S. 156, 15 S. Ct. 42, 39 L. Ed. 106. If they constituted part of one transaction, they should be read together as affirming one agreement. Empire Gas & Fuel Co. v. Stern (C. C. A.) 15 F.(2d) 323; Bailey v. Railroad Co., 17 Wall. (84 U. S.) 96, 21 L. Ed. 611; Metropolitan Securities Co. v. Ladd (C. C. A.) 173 F. 269.

■ The parties to the agreement to incorporate were Morris and Markle, as one party, and Henry G. and Robert J. Bulkley, as the other. This agreement was executed January 1, 1921, and a syndicate agreement was executed thereafter by each of the subscribers over a period of six months. The agreement to incorporate involved the organization of the corporation to take over the property of the Ohio company and the control of the new corporation after formation. The syndicate agreement was a subscription to stock of the new corporation and the conducting of a public sale of the stock subscribed for. The parties were the corporation and the subscribers. The subject-matter of the two agreements and the legal relations created thereby are different. Several instruments between the same parties, executed at the same time, and dealing with the same subject-matter, are read as one; but the absence of one or more of such elements of identity may make clear that the instruments are independent of each other. For instance, where the parties to the instrument are different, they do not constitute one agreement (Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 S. Ct. 770, 33 L. Ed. 157; Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 155 U. S. 156, 15 S. Ct. 42, 39 L. Ed. 106), or where instruments are executed at different times (Baird v. Erie R. Co., 210 N. Y. 225, 104 N. E. 614), or where the subject-matter is different (Bailey v. Ry. Co., 17 Wall. [84 U. S.] 96, 21 L. Ed. 611; Lillard v. Ky. Distilleries & Warehouse Co. [C. C. A.] 134 F. 168).

The appellant argues that, under the terms of the agreement, "responsible parties" referred to in the incorporation agreement was a condition of the syndicate agreement precedent to subscription liability; that the subscribers Harrison, Morris, and Hosick Crawford & Co. were not responsible, and therefore the appellant is not liable. The responsible parties clause, appearing only in the promoters' contract, was obviously designed for the protection of the Bulkleys, who were turning over the assets of the Ohio company to the new corporation, and were demanding that the new corporation should be adequately and sufficiently financed. The underwriting syndicate agreement merely provided that attachment of subscription liability thereunder was conditioned upon 10,000 shares of preferred stock and 20,000 shares of common stock being subscribed on counterparts thereof within 90 days of April 1, 1921. The agreement allowed approximately a year and a half in which to pay off their subscriptions. It was expected that the subscribers would pay but a small part of the original obligation, because the syndicate expected to sell the shares at the public offering. This factor could well have been considered in the syndicate manager determining who were responsible parties.

■ However, the only evidence offered as to Harrison was merely the testimony given by him, in which he said that "Mr. Morris suggested I subscribe to $50,000 stock in the Positype Corporation, and I told him that I was not in any financial condition for that; that there was trouble in my own business." It was also proposed to show by Harrison

that he had subscribed, but not paid for, stock in another corporation, and that he gave notes for the Positype stock, which in November, 1927, had not been paid. Without showing Harrison's financial inability to pay, a jury question was not presented. Trouble in business did not mean that he was financially irresponsible, nor may it be inferred from the fact that he had outstanding debts covered by his note obligations.

As to Morris, who is an officer of a large financial institution, the only testimony of his financial irresponsibility is that given by Harrison, who said that "Mr. Morris assured me there was no risk, and that he himself was tied up, and that he could not pay for his subscription if he was called upon to do so." This did not create an issue of fact as to Morris' financial responsibility.

The evidence that Hosick Crawford & Co. was not a responsible party was equally as trivial. This concern was a brokerage partnership dealing in securities. No evidence was offered as to the financial condition of the individual partners. If the corporation, through its managers, procured subscribers to stock in good faith of people apparently able to pay, all subscribers are bound by such action. Penobscot R. Co. v. White, 41 Me. 512, 66 Am. Dec. 257; Holman v. State, 105 Ind. 569, 5 N. E. 702; Heiskell v. Morris, 135 Tenn. 238, 186 S. W. 99, Ann. Cas. 1918B, 1134.

A further argument advanced is that the voting trust provided for in the agreement to incorporate was not established until July 1, 1922, and the contention is that this was a condition subsequent to appellant's obligation to pay for his stock. But the syndicate agreement in no way referred to the voting trust, and the agreement to incorporate contains no provision that the trust shall be set up within any stated time. This is no defense to a suit on the stock subscription. Merrill v. Reaver, 50 Iowa, 404.

Further, it is said that the agreement to incorporate provided that of the 50,000 shares of common stock, which were to be issued to the Bulkleys in exchange for the assets of the Ohio company, 20,000 shares would be transferred to the syndicate, and 10,000 shares go back to the treasury of the corporation, and the contention is that this was not done, and that therefore the appellant is not obliged to pay. The common stock of the syndicate members was held in the treasury of the corporation, ready and available for them upon payment of their respective subscriptions. This was the only obligation of the appellee to the appellant. The agreement signed by appellant constituted a subscription to the stock of the appellee, and is very clear. The appellant intended to become a shareholder without further action his part, when the conditions of his subscription agreement were carried out by the appellee. The agreement remained open and unrevoked; the corporation was formed in pursuance to the terms made, and the appellant's subscription was accepted. Such an agreement is valid and binding as a subscription to capital stock of the appellee. McNaught v. Fisher (C. C. A.) 96 F. 168; Avon Springs Sanitarium Co. v. Weed, 119 App. Div. 560, 104 N. Y. S. 58; 189 N. Y. 557, 82 N. E. 1123.

It is argued that the appellee should have made tender of the stock in order to recover; but the rule is well settled that it is no defense to an action on a subscription to allege that the corporation has not delivered or tendered to the appellant the certificate of stock to which he is entitled. Clark v. Andrew (C. C. A.) 11 F.(2d) 958; In re Hannevig (C. C. A.) 10 F.(2d) 941.

The charge of bad faith on the part of the promoters finds no support in the record. Moreover, it is difficult to understand why the charge is made. Good faith of the promoters is shown beyond dispute. Confidence in the project promoted was displayed by the large subscriptions and investment of the gentlemen who are attacked, and this attack is made by one seeking to avoid his plain contract obligation, after having, on several occasions, reaffirmed his obligation to pay. His reaffirmation of liability places a heavy burden, which greatly handicaps his attempted effort to escape responsibility. This he may not do. Ogilvie v. Knox Ins. Co., 22 How. (63 U. S.) 380, 16 L. Ed. 349; Knickerbocker Trust Co. v. Evans (C. C. A.) 188 F. 549; Bartol v. Walton & Whann Co. (C. C.) 92 F. 13; Buffalo & J. R. Co. v. Gifford, 87 N. Y. 294.

Judgment affirmed.