ELECTRIC WELDING COMPANY, Limited, *vs.* FREDERICK H. PRINCE & others.

SAME *vs.* WILLIAM S. EATON.

Suffolk.    November 16, 19, 1906. — May 13, 1907.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Corporation*, Enforcement of subscriptions for shares. *Agency.    Contract.    England.    Companies Act.    Conflict of Laws.    Evidence*, Presumptions and burden of proof. *Practice, Civil*, Death of party. *Executor and Administrator. Statute.*

In actions by a corporation to enforce subscriptions for its shares, it appeared that the plaintiff corporation was organized by a promoting corporation to purchase and use certain patent rights for the purchase of which the promoting corporation had a contract with their owner, and that the defendants signed underwriting agreements with the promoting corporation in accordance with the terms of a certain prospectus, by which each of the defendants agreed to apply for a certain number of shares of the plaintiff corporation which were to be allotted and paid for only in case the general public should fail to take the whole number of shares offered for public subscription, it being provided that then the applicant was to be allotted his proportion of the deficiency *pro rata* with the other persons who were similarly interested in this arrangement.    The defendants in pursuance of these agreements severally signed applications for allotments of shares in the plaintiff corporation and handed them to the promoting corporation to be used by it under the terms of the underwriting agreements. Owing to the state of the market for securities, fifteen months elapsed after the making of the underwriting agreements before the shares of the plaintiff corporation were offered to the public, more than a year later than the time contemplated by the prospectus.    The public took only about two per cent of the shares offered.    Each underwriting agreement was addressed to the agent of the promoting company, and provided as follows : "In the event of my failing to put in an application when called upon by you, I hereby authorize you to make application on my behalf, and I agree to accept the allotment which may be made to me against such application, subject to the conditions before stated."    The promoting corporation, without calling upon the defendants to apply for their respective proportions of the shares of the plaintiff corporation not taken by the public, delivered to the plaintiff corporation the applications for shares signed to the defendants, and allotments were made to them of their respective proportions of ninety-eight per cent of the shares which had been offered to the public.    Between the time of the execution of the underwriting agreements and applications for shares by the defendants and the time that the promoting corporation delivered their applications to the plaintiff, the contract between the promoting corporation and the owner of the patents was changed in regard to the price to be paid for the patents in such a way that the working capital of the plaintiff corporation was reduced, but by an amount less

than ten per cent of the sum originally named. The promoting corporation itself had underwritten a certain number of the shares of the plaintiff corporation. By further changes in the contract between the promoting corporation and the owner of the patents the number of shares of the plaintiff corporation to be taken by the owner of the patents was reduced almost one half and the number of shares to be issued was reduced in a similar proportion, the result of which was to make the number of shares applied for by each of the defendants represent a much larger proportion than before of the number of shares offered to and not taken by the public. Each of the defendants had made a cash payment to the promoting corporation under his contract with it. The promoting corporation had kept this money, and the defendants had acquiesced in its keeping it. One of the questions in the cases was whether the promoting corporation in delivering the defendants' applications for shares to the plaintiff corporation was acting in behalf of the defendants with their authority. On this question it was *held*, that whether a reduction of less than ten per cent in the amount of the plaintiff's working capital was a material change from the statement made in the prospectus on which the defendants' applications were founded, it was not necessary to consider, because it appeared that the prospectus and the underwriting agreements left the promoting corporation free to make such changes in its contract for the purchase of the patent rights as it found it for its interest to make, its interest as subscriber for a part of the plaintiff's shares being assumed to be the same as that of the defendants; that the defence of the lapse of time between the execution of the underwriting agreements and the attempt to place the shares on the market, if this was contrary to the original proposition, probably was not open to the defendants as showing a termination of the authority of the promoting corporation to deliver their applications, as the defendants had acquiesced in the retention by the promoting corporation of the money paid by them to it under their contract with it, but this point was not passed upon; and it was *held*, that the change by the underwriting corporation of the basis on which the defendants had agreed to underwrite the shares, by the reduction of the number of shares to be taken by the owner of the patents and of the total number of shares to be issued, deprived the promoting corporation of its authority to deliver the applications in behalf of the defendants; *also*, that under the terms of the underwriting agreements signed by the defendants, the promoting corporation had no authority to make applications for shares in behalf of the defendants without first calling upon them to apply for their respective proportions of the shares not taken, thus giving them an opportunity to break their contracts with the promoting corporation and incur liability to it for damages by revoking its authority to deliver the applications signed by them.

In actions by a corporation against subscribers for its shares to enforce calls for payments thereon, it appeared that the plaintiff was incorporated in England under the companies act, that by the law of England so long as a person suffers himself to remain as a shareholder on the register of such a company he is bound to pay all calls properly made upon him for payment of the capital stock upon shares of which he is the registered holder, and that, if a registered shareholder has a just ground for repudiating the allotment of shares to him, he must repudiate it without delay or lose his right of repudiation. The defendants were the registered holders of the shares on which the payments were called for by the plaintiff. They remained shareholders without any act of repudiation on their part for two years and eight months, when they refused payment of the calls for the collection of which the actions were brought. After the

bringing of the actions and before the filing of the report of the auditor to whom the cases had been referred a further period of more than ten years elapsed, during which the defendants remained shareholders and never repudiated the allotments of shares to them " except in so far as their failure to pay upon demand constituted such repudiation." *Held*, that a bare refusal to pay calls is not a repudiation of the allotment of the shares on which the calls are made, and therefore that the period of the defendants' acquiescence continued after the bringing of the actions, but that this was unimportant, because the period which had expired before the actions were brought was enough to bar the defendants from afterwards repudiating their status as registered shareholders.

Whether a person is a registered shareholder of a corporation organized in England under the companies act is to be determined by the law of England when proved as a fact, and this necessarily includes the determination of the effect of a failure to repudiate an allotment of shares in such a corporation.

Proof that a letter was mailed is *prima facie* evidence that it was received by the person to whom it was addressed.

R. L. c. 171, § 5, which by its language, taken literally, seems to provide that an executor or administrator can be summoned in to prosecute or defend a personal action which survives only when a sole plaintiff or defendant dies before the entry of the action, was intended to be a re-enactment of Pub. Sts. c. 165, §§ 5–7, corresponding to Rev. Sts. c. 93, §§ 1–3, and, properly interpreted, provides also for the suggestion of death and the voluntary appearance or summoning in of the executor or administrator when the death has occurred after the entry of the action and where the party who has died was not a sole plaintiff or defendant.

TWENTY ACTIONS OF CONTRACT to enforce subscriptions for shares of the plaintiff, as described in the opinion. Writs dated May 12, 1894.

The form of application for ordinary shares referred to in the opinion was as follows:

" The Electric Welding Company, Limited.
Share Capital  .  .  .  £460,000,
In 45,000 Ordinary Shares of £10 each and 1,000 Founders'
Shares of £10 each.
Form of Application for Ordinary Shares.
(To be retained by the Bankers.)

" To the Directors of The Electric Welding Company, Limited.

" Gentlemen, — I enclose remittance for the sum of £25 being a Deposit of 10s. per share on an Application for fifty Ordinary Shares of £10 each in the above Company, I request you to allot me that number of Ordinary Shares upon the terms of the Prospectus, and I hereby agree to accept such Shares, or any less number allotted to me, and I agree to pay the further sum of £3. 10s. per Share on allotment, and the balance as

required in the terms of the Prospectus; and I authorize you to place my name on the Register of Shareholders in respect of such Shares, and I agree to waive any fuller compliance with Section 38 of the Companies Act, 1867, than that contained in such Prospectus. In the event of the Shares not being allotted to me, the amount to be returned in full.

> "Name (in full)
> Address
> Occupation
>
> "Date                          1890."

The form of the underwriting letters which are described in the opinion was as follows:

> "The Electric Welding Company, Limited.
> Issue of

| | | |
|---|---|---:|
| 45,000 Ordinary Shares of £10 each | . . . . . | £450,000 |
| 1,000 Founders' " £10 " | . . . . . | 10,000 |
| | | £460,000 |

of which 15,000 Ordinary Shares and 500 Founders' Shares are taken by the vendor. The remaining 500 Founders' Shares will be subscribed by the guarantors of subscriptions for the first £250,000 of Ordinary Share Capital, in the proportion of one Founders' Share for each fifty Ordinary Shares guaranteed.

"To E. F. Lenon, Esq.

"Dear Sir, — I agree, on the issue of the prospectus attached hereto, to apply for one of the above Founders' Shares of £10 each, and fifty of the above Ordinary Shares of £10 each, paying for same on the conditions specified in the prospectus issued to the general public, on the condition that I am to have such Founders' Shares allotted to me.

"But if, on the public issue of the prospectus, the whole of the above Ordinary Shares offered for subscription be applied for by the general public, then no allotment is to be made to me in respect of this agreement. If the said Ordinary Shares be only partially applied for by the general public, then I am only to be allotted my proportion of the deficiency *pro rata* with the other persons who are similarly interested in this arrangement. In either case it is understood I am to receive an allotment of the said Founders' Shares, but I am not to be entitled to any

other commission upon any allotment that may be made under this agreement.

"In the event of my failing to put in an application when called upon by you, I hereby authorize you to make application on my behalf, and I agree to accept the allotment which may be made to me against such application, subject to the conditions before stated.

"It is further clearly and honorably understood between us that I will effect no sales either directly or indirectly until after the general allotment has taken place.

> " Signature
> Address
> Date                          1890."

The finding of the auditor in regard to the prospectus referred to in the foregoing form was as follows: " The underwriting agreement or offer referred to a 'prospectus attached hereto.' No prospectus, as a fact, was so attached. At that time, the ' Draft Prospectus ' known as ' No. 9 ' was the only prospectus which had been issued. It was prepared, it may be inferred, for the purpose of being shown to the underwriters, and its contents, or the substance thereof, were undoubtedly seen or known by them. The evidence did not show to what extent, if at all, they were informed of or relied upon the terms of the purchase contract referred to in the prospectus." The material statements in this draft prospectus are quoted in the opinion.

The cases and the manner in which they were brought before this court by a report of a judge of the Superior Court are described fully in the opinion.

*E. F. McClennen,* for the plaintiff.

*C. A. Hight,* (*W. H. Coolidge & G. S. Selfridge* with him,) for the defendants.

*H. LeB. Sampson,* for the executor of the will of William S. Eaton.

LORING, J. Under the titles of these two cases we have before us twenty cases brought to recover certain sums alleged to be due to the plaintiff from the defendants, in payment of their several subscriptions to shares in its (the plaintiff's) ordinary share capital. The cases were sent to an auditor. The evidence at the trial consisted of his report and other

evidence, some of which was not before him. The presiding judge directed a verdict for the defendants and reported the cases to this court.

Before the cases came on for trial, Eaton, the defendant in one of the actions, died, and his executor was summoned in to defend against his objection and exception. The question raised by this exception is also submitted to us by this report.

The circumstances out of which these actions arose are stated at length in the auditor's report and are in substance as follows:

In October, 1889, the Thomson European Electric Welding Company (which we shall hereafter speak of as the Thomson Company), being the owner of certain patents for Great Britain and Europe for welding iron by electricity, entered into a contract with one Lenon, by which Lenon agreed to form a company to buy its patents. The plaintiff company was incorporated under the English companies acts in pursuance of this agreement. Lenon further agreed in this contract to have thirty thousand ordinary shares of the capital stock of the plaintiff corporation underwritten, and, when that had been done, to have the ordinary shares advertised for public sale. It was further provided in this agreement that the transfer of the patents was to take place when thirty thousand ordinary shares had been subscribed for, and that the whole transaction should be completed before June 1, 1890. This contract was entered into by Lenon as agent for the London Contract Corporation (which we shall speak of hereafter as the Contract Corporation), and its performance was guaranteed by that corporation.

During the months of April and May of the same year, the promoters procured some sixty-four or sixty-nine underwriting agreements in the United States, most of them in and about Boston. At this time the Contract Corporation was in fact and in law the promoter, for Lenon was acting as its agent in making the contract already spoken of. Later on (as will be stated) he dropped out and a new contract was made between the Thomson Company and the Contract Corporation. Since Lenon acted as agent of the Contract Corporation in all he did, this change did not affect the legal relations of the parties, and we shall hereafter in all cases speak of the promoters generally, without

regard to the time in question being before or after Lenon dropped out. The sixty-four or sixty-nine underwriters included the twenty defendants now before the court.

These underwriting agreements between the promoters and the defendants were in the form of an underwriting letter signed by each defendant on a blank prepared by the promoters. This letter being accepted by the promoters became a binding contract between the promoters and the several defendants. The auditor found that this letter was an offer by the several defendants to the promoters not accepted by the promoters. In this matter we are of opinion that (on the facts stated in his report) the auditor was wrong. We shall consider this matter later on.

With the underwriting agreement each defendant handed the promoters an application for fifty ordinary shares of £10 each and another application for one founders' share, and paid to the promoters £25, being ten shillings per share on the fifty ordinary shares, and being payment in full, £10, for the one founders' share.

The rights of the parties to this contract of underwriting are to be gathered from the four corners of this underwriting letter and the preparatory draft prospectus referred to therein, and will have to be construed with care before this case is disposed of. It is not necessary, however, in stating the sequence of events, to go into that matter now.

On May 1, 1890, the plaintiff company was incorporated under the English companies act.

By a series of supplementary agreements the time for bringing out the plaintiff company was postponed until October 27, 1891, when the transfer of the patents to it by the Contract Corporation was carried into effect. In one of these agreements Lenon dropped out, as we already have said. At that time releases were executed by Lenon, the Thomson Company and the Contract Corporation, and a new contract was made between the Thomson Company and the Contract Corporation. Changes also were made in the make up of the plaintiff company, and in the terms on which the purchase of the patents was to be made.

No further underwriting agreements were procured by the promoters between May, 1890, and August of the following

year.   In August, 1891, the promoters procured further under-
writing agreements for all the ordinary shares subsequently
offered to the public except nineteen hundred and seventeen,
and these the Contract Corporation, the promoter, elected to
underwrite itself.

On August 28, 1891, sixteen thousand six hundred and sixty-
seven ordinary shares were offered to the public.   The public
took four hundred and seventy-two, a number slightly in excess
of two per cent of the amount offered.

The applications for ordinary shares signed by the defendants
were each of them for fifty ordinary shares, with the exception
that the defendant Wetherbee's application was for one hundred
ordinary shares.   The directors of the plaintiff company, on
these applications being filed with them, allotted to each ninety-
eight per cent of the amount applied for, that is to say, forty-nine
shares to each defendant except Wetherbee, and ninety-eight to
Wetherbee.   At the same time the Contract Corporation paid
to the plaintiff company the sums paid it by the defendants,
being ten shillings a share on the fifty shares applied for (£25
in case of each defendant except Wetherbee, and £50 in case of
Wetherbee), and payment in full for the founders' shares applied
for (£10 in case of each defendant except Wetherbee, and £20
in case of Wetherbee).

"Notice of the allotments was duly made," and "In due time
the names of the defendants were placed upon the list of regis-
tered shareholders of ordinary stock and are still upon the list,"
to quote the findings of the auditor.

By the terms of the application through its reference to the
prospectus issued to the public, a further sum of £3 10*s.* became
due from each holder of ordinary shares on allotment, and a first
instalment of £2 a share became due on October 31, 1891, under
a call duly made.   Notices of this call were duly mailed to each
defendant.

On May 20, 1892, the defendant Prince paid £171, being the
£3 10*s.* per share due on his forty-nine ordinary shares on their
being allotted to him, and on the same date the defendant Pope
paid £98, being the £2 due as the first instalment on each of
his forty-nine ordinary shares.

The actions now before us were brought in May, 1894.   In

them the plaintiff seeks to recover from the defendant Prince £98, being the first instalment of £2 a share on forty-nine ordinary shares, and from the defendant Pope £171, being £3 10s. due on allotment on his forty-nine ordinary shares. From the seventeen defendants other than Wetherbee like sums of £171 + £98, or £269 each, and from Wetherbee double that amount, or £538, were sued for.

Each declaration contains three counts. In the first the plaintiff alleges that the defendant in question applied for fifty shares and was allotted forty-nine, and so became liable to pay the sums sued for. In the second it is alleged that the defendant applied for shares, was allotted shares, and was put on the register as a shareholder; and being a shareholder, is liable for the sums sued for. The third count alleges that an underwriting contract was made between the plaintiff and the defendant, under which it allotted forty-nine shares to that defendant, and that in this way he became liable to pay the sums sued for.

It is plain that no underwriting agreement was made between the plaintiff and the defendants. The Contract Corporation agreed with the Thomson Company that it would find underwriters for the capital stock of the plaintiff company, and agreements were made between the Contract Corporation and the several defendants, by which the several defendants agreed with the Contract Corporation to underwrite the fifty ordinary shares of the plaintiff company on the terms therein stated, and in pursuance of that agreement between the Contract Corporation and the several defendants the defendants handed the Contract Corporation applications to be used by it in behalf of the defendants under the terms of these agreements. If the agreements between the Contract Corporation and the defendants authorized it to deliver the applications, a case under the first count was made out. But in no event were the allegations of the third count proved.

This brings us to the defence set up to the first count.

The defence set up to the first count is that the adventure into which the underwriters were put was materially different from that stated in the preparatory draft prospectus.

The first difference relied on by the defendants is that the contract between the Contract Corporation and the Thomson

Company was materially changed in that the plaintiff company was to have started with £50,000 working capital, and in fact started with £46,539. We do not find it necessary to consider whether a reduction of less than ten per cent in working capital would be a material change, for we are of opinion that there is nothing in the agreement between the Contract Corporation and the several defendants which prevented the Contract Corporation from making changes in its contract with the Thomson Company. There is no reference to the latter contract in the underwriting letter, and the only reference to it in the " Preparatory Draft Prospectus " (referred to in the underwriting letter) is a statement that the plaintiff company is to have all improvements thereafter made by Professor Thomson. It is stated in this draft prospectus that the founders " have subscribed for ordinary shares, and have guaranteed the subscription of the remainder of the share capital." The underwriting letter states that the capital is to be forty-five thousand ordinary shares, all of which is to be issued, " of which fifteen thousand ordinary shares and five hundred founders' shares are taken by the vendor. The remaining five hundred founders' shares will be subscribed by the guarantors of subscriptions for the first £250,000 of ordinary share capital, in the proportion of one founders' share for each fifty ordinary shares guaranteed."

Putting these two statements together it is in effect an agreement by the Contract Corporation to take five thousand out of thirty thousand ordinary shares, giving the privilege of subscribing to the five hundred founders' shares as the commission to be paid to the underwriters for underwriting twenty-five thousand ordinary shares. Thus the Contract Corporation had an interest in the contract between it and the Thomson Company as to the terms on which the patents were to be sold to the plaintiff company, and the underwriting agreement between the Contract Corporation and the defendants left it to the Contract Corporation to make such changes in the purchase contract as it found to be for its interest to make, presumably because its interest was identical in that respect with that of the underwriters.

The next difference on which the defendants rely is the lapse of time. Fifteen months less one day expired between the date of the last underwriting contract here in question and the day

when the ordinary shares were offered to the public. The defendants' contention is that under their agreement to underwrite shares in the plaintiff company they were not bound to keep money ready to answer to that investment for an indefinite time, and therefore the Contract Corporation was bound, in order to hold them, to launch the new company within a reasonable time, if not within the year 1890. The claim that the Contract Corporation was bound to bring out the new company within the year 1890 is founded on the fact that it is stated in the preparatory draft prospectus that the " Lists of applications will open · on the       day of       1890, and will close on or before the       day of       1890." The plaintiff's answer to this contention is that the jury were warranted in finding that, owing to the state of the financial market in London consequent on the failure of Baring Brothers and Company, it was impossible to bring out a new company on that market with any hope of success in the year 1890 or in the early part of the year 1891 ; that the Contract Corporation owed a duty to the underwriters in the choice of the time when the company should be brought out; and that the Contract Corporation was right in not bringing out the company earlier than it was brought out. But if that be true, it does not follow that the Contract Corporation was authorized to make application in behalf of the defendants as underwriters after a reasonable time had expired or after the close of the year 1890 (if the contract between the Contract Corporation and the defendants was limited to the year 1890). If the adventure underwritten could not be carried through within the time contemplated, the agreement was at an end. Were it not for one fact we should have been inclined to the opinion that the plaintiff company had to be brought out within the year 1890 or that at any rate it was not brought out within a reasonable time, and that for that reason the Contract Corporation was not authorized to use the applications signed by the defendants as underwriting applications at all. The one fact which makes us hesitate to come to that conclusion is that each defendant had paid to the Contract Corporation £35, except Wetherbee, who had paid £70, and that so long as the Contract Corporation kept that money and the defendants acquiesced in its keeping it, it is hard to see how either party could have

thought that the agreements between the Contract Corporation and the defendant underwriters had come to an end.

We do not find it necessary to come to a final conclusion on this point.

But there are two other, and in our opinion fatal, objections to the use which the Contract Corporation made of these applications. The first objection is this : By the terms of the underwriting letter, the signer of it agreed to underwrite " fifty of the above ordinary shares of £10 each," on condition that " I am only to be allotted my proportion of the deficiency *pro rata* with the other persons who are similarly situated in this arrangement." The words " above ordinary shares " refer to the heading of the underwriting letter, where it is stated that the issue is an " issue of 45,000 ordinary shares " " of which 15,000 ordinary shares and 500 founders' shares are taken by the vendor. The remaining 500 founders' shares will be subscribed by the guarantors of subscriptions for the first £250,000 of ordinary share capital, in the proportion of one founders' share for each fifty ordinary shares guaranteed." The underwriting agreement therefore was to take fifty twenty-five thousandths of the shares not taken by the public, in which, as we already have said, the Contract Corporation was to take the other five thousand not taken by the vendor. By subsequent changes in the contract between the Thomson Company and the Contract Corporation the number of shares to be taken by the vendor was reduced from fifteen thousand to eight thousand three hundred and thirty-three, and the issue was likewise reduced from forty-five thousand to twenty-five thousand ordinary shares, leaving sixteen thousand six hundred and sixty-seven to be offered to the public. While, as we already have stated, the Contract Corporation had a right to change the contract between itself and the Thomson Company, and so had a right to change the contract price to be paid by the plaintiff company for the patents, it had no right to change the basis on which the defendants had agreed with it, the Contract Corporation, to furnish the underwriting which it, the Contract Corporation, had agreed with the Thomson Company to secure. When it was determined that sixteen thousand six hundred and sixty-seven shares in place of thirty thousand shares were to be offered to

the public under the terms of the underwriting contracts between the Contract Corporation and the defendants, the Contract Corporation was bound to take absolutely five thousand thirty thousandths of them; the shares then left were to be offered to the public, and each defendant was bound to take fifty twenty-five thousandths of what were not taken by the public. In place of using the applications on that basis the Contract Corporation undertook to use them as applications to take fifty sixteen thousand six hundred and sixty-sevenths of those not taken by the public.

The second objection to the authority of the Contract Corporation to use the application as it did is this : By the terms of the underwriting letter it was only " in the event of my failing to put in an application when called upon by you, [that is, by the promoter] " that the underwriter authorizes the Contract Corporation to make application in his behalf.

It appears that on the public's taking four hundred and seventy-two shares only, the Contract Corporation made application for shares in behalf of the defendants without calling upon the defendants to apply for their respective proportion of the shares not taken.

It is one thing to agree with a promoter to apply for a certain proportion of the shares of a new company not taken by the public; it is quite another thing actually to become a shareholder in the new company for the number of shares so ascertained. In the first case the underwriter can refuse to become a member of the company in pursuance of his contract with the promoter. If he does refuse to do so, he is liable to the promoter for any damages which he, the promoter, may have sustained from that breach of contract. But the underwriter may prefer paying damages to becoming a member and so liable to pay the amount due in respect of the shares in question. See in this connection *Gorrissen's case*, L. R. 8 Ch. 507. The clause here in question manifestly was inserted to give the underwriter this *locus penitentiae*, and the Contract Corporation had no right to make any application for shares in behalf of the defendants until they had severally failed to put in an application when called upon by the Contract Corporation so to do, in which case, as we have said, its authority could be revoked by the underwriter,

although to revoke it would expose the underwriter to action for damages for breach of contract.

For these two reasons we are of opinion that the plaintiff failed to prove that an application for shares authorized by the defendants was made by them or in their behalf, and the plaintiff's case on the first count failed.

But we are of opinion that the plaintiff made out a case on the second count.

It was proved in the case at bar as a fact that, by the law of England, so long as a person suffers himself. to remain as a shareholder on the register of such a company as we are dealing with, he is bound to pay all calls duly made for payment of the capital stock in respect to shares ·of which he is the registered holder.

The law of England being that a shareholder is liable to pay calls so long as he is a shareholder, the question of a shareholder's liability to pay calls has arisen in England in suits to have his name removed from the list and in similar proceedings ; and it is the law of England (as appears from the evidence in this case) that where a person (whose name has been put on a list of shareholders on his application) has a right by reason of misrepresentation, (see *Oakes* v. *Turquand,* L. R. 2 H. L. 325, *Ashley's case,* L. R. 9 Eq. 263,) or a subsequent change in or misunderstanding as to the make up of the company, (*Lawrence's case,* L. R. 2 Ch. 412, *Wilkinson's case,* L. R. 2 Ch. 536, *Perrett's case,* L. R. 15 Eq. 250,) to repudiate the allotment of shares to him, he must repudiate his being a shareholder without delay or lose his right to do so.   The principle on which this rule is founded is that a person who has a right to repudiate being a shareholder cannot lie by and await the financial success or failure of the company and then exercise his right of repudiation.   *Lawrence's case,* L. R. 2 Ch. 412, and other cases *supra.*

In the case at bar it was found by the auditor that " none of the defendants ever notified the plaintiff company or the promoters of the withdrawal of the underwriting offers or applications and have never repudiated the allotment except in so far as their failure to pay upon demand constitutes such repudiation." That is to say, from August 31, 1891, to December 2, 1904, when the auditor's report was filed, a period of over thirteen years,

these defendant's have been shareholders in the plaintiff company, entitled to all the benefits ensuing therefrom, including the right of sharing in its success, if it was a success, without any act of repudiation on their part.  In the case at bar all that the defendants did was to refuse to pay calls.  A bare refusal to pay calls is not a repudiation.  A refusal to pay calls is no more a repudiation of the status of a shareholder than a refusal to pay what is due under a contract which can be rescinded is a rescission.  For this reason, in our opinion, the period of acquiescence runs after suit brought.

But that is not important here.  Two years and eight months and more had expired after allotment before these actions were brought.  That is enough to bar the defendants from afterwards repudiating if the time after suit brought is to be excluded.  See *Lawrence's case, ubi supra; Wilkinson's case, ubi supra; Ex parte Boyle,* 52 L. T. (N. S.) 501.

The defendants' answer to this contention is first, that the privilege of applying to have their names removed from the list of shareholders is a remedy given by the English law ; and second, that the underwriting letters were mere offers on their part, and they being mere offers and offers not accepted within a reasonable time, the defendants were not called upon to repudiate their position as registered shareholders.

In the first place, the company in question being an English one, the liability to pay calls as matter of contract is to be determined by the English law.  *Anglo-American Land, Mortgage & Agency Co.* v. *Dyer,* 181 Mass. 593.  In the second place, the question whether as between the company and a shareholder a person is or is not a shareholder is a question of law so peculiarly to be decided by the laws of the country by which the company is incorporated that ordinarily the courts of this State will not entertain jurisdiction of a case involving that question.  *Smith* v. *Mutual Ins. Co.* 14 Allen, 336.  *Kimball* v. *St. Louis & San Francisco Railway,* 157 Mass. 7.  *National Telephone Manuf. Co.* v. *Du Bois,* 165 Mass. 117.  *Wason* v. *Buzzell,* 181 Mass. 338.

It is plain that the effect of the failure to repudiate the allotment of shares depends upon the law of England, and that it is a matter going to the merits of the question of the defendants' being or not being shareholders in the plaintiff company.

The defendants' other defence to the second count is not in our opinion made out.

It was held in *Somerville's case*, L. R. 6 Ch. 266, that if shares were put in the name of a person without his having applied for them he was not under a duty to repudiate within a reasonable time. The principle on which this case was decided is put in these words by Lord Hatherley, at p. 272: "The mere fact of standing by and being told there is something done which you have not authorized, cannot fix you with the heavy liabilities which shares in a joint stock company would create. We are all subject to have things sent to us at our houses by persons with whom we have nothing whatever to do, and I think that the mere writing to this gentleman, telling him that something had been done, was not enough to fix him." In that case the shareholder's name was not put on the list under color of authority.

*Gorrissen's case*, L. R. 8 Ch. 507, the other case relied on by the defendants in this connection, is not a case of this kind. That case, so far as the question now before us is concerned, goes on the ground that the notice sent to Gorrisen was not that he was a shareholder but that having agreed to place one thousand shares his name was entered "as the person to be referred to respecting those shares." See p. 517.

This case would not come within *Somerville's case* even if the auditor was right in his conclusion that the underwriting letters were unaccepted offers and remained so until August, 1891. Even if that were so, each defendant had entrusted a written application for shares to the Contract Corporation's agent Lenon, and they knew that an allotment had been made on that application. Whether that allotment was binding on the several defendants depended upon the authority of the Contract Corporation, under all the circumstances, to deliver those applications to the plaintiff company, as it did in behalf of the several defendants.

On the facts stated in the auditor's report we do not see why the auditor came to the conclusion that these underwriting letters were unaccepted offers although it is not necessary to express a final opinion on this point. These underwriting letters were signed at the solicitation of a promoter who had agreed to furnish underwriters for the ordinary share capital, and who

offered as an underwriting commission the privilege of subscrib-
ing to one's founders' share. What made the subscription to
the founders' share a privilege was the fact that after a dividend
of ten per cent had been paid on the ordinary shares the sur-
plus income was to be divided equally between the founders'
shares (one thousand in number) and the ordinary shares (forty-
five thousand in number, according to the preparatory draft
prospectus and the underwriting agreement).

Had the public taken all the ordinary shares issued, could
there have been any question as between the Contract Corpora-
tion and the defendants as to their right to the commission of
one founders' share for which each had paid the Contract Cor-
poration in fact? And again, had the public not taken all the
stock and that taken by the underwriters had gone to a pre-
mium and the Contract Corporation had not included the de-
fendants among the underwriters, there could be no question
(in our opinion) of the defendants' right to damages from the
Contract Corporation for not getting the shares to which they
were entitled. In the English cases cited at the argument, *Ex
parte Stark*, [1897] 1 Ch. 575, *In re Bultfontein Sun Diamond
Mine*, 12 T. L. R. 461, and *In re Gutta Percha Corp*. 15 T. L. R.
183, the underwriting agreement was not with one who had
underwritten the whole share capital, but was procured on be-
half of the company itself. And further, in the first two cases
the blank used in making out the underwriting contract called
for an acceptance ; and in *Ex parte Stark* the underwriter agreed
to underwrite " on the amount of shares for which you accept
this contract as below." See p. 577.

In spite of the fact that the underwriting contract was made,
if at all, with the company and not with one who had agreed
with the company to furnish underwriters for its capital stock,
it was held in *In re Bultfontein Sun Diamond Mine*, 12 T. L. R.
461, that a contract was completed by retaining the under-
writing letter.

The fact found by the auditor that Prince and Pope subse-
quently paid the two sums afterwards paid by them in ignorance
of the variations from the contract made by the underwriting
letters is not material. The two changes which in our opinion
were material consisted in the fact that the underwriters had not

been applied to before the applications signed by them were used on which the allotments were made. That fact the defendants knew. The other fact, namely, that these applications had been used as applications for fifty sixteen thousand six hundred and sixty-sevenths of those not taken by the public in place of fifty twenty-five thousandths of those not taken by the public after five hundred had been taken by the Contract Corporation, it was their duty to find out. Cairns, L. J. in *Lawrence's case*, L. R. 2 Ch. 412. *Ex parte Boyle*, 52 L. T. R. (N. S.) 501.

We are therefore of opinion that the presiding judge was wrong in directing a verdict for the defendants on the second count. A verdict should have been directed for the plaintiff on that count in the actions against Prince and Pope, and the other cases should have been left to the jury on the question of the defendants having knowledge of the allotment, that is to say, on the question of their having received the letters mailed to them, if there was any evidence to rebut the *prima facie* case made out by proof that they were mailed. See *Briggs* v. *Hervey*, 130 Mass. 186 ; *Hedden* v. *Roberts*, 134 Mass. 38. But under the terms of the report all the cases are to be remanded for a new trial.

The question of the jurisdiction of the court to summon in the executor of the defendant Eaton remains to be disposed of.

Eaton died in June, 1902, some eight years after the entry of the action. His death was suggested of record by the plaintiff, and on his motion Eaton's executor was ordered to appear and defend the action. The motion and the order thereon having been served upon the executor, he appeared specially and suggested that Eaton having died after the entry of the action there is no jurisdiction in the court to summon in his executor, and prayed that the action be dismissed. This motion was denied. To this the executor took an exception which is before us on this report.

In our opinion this exception must be overruled.

The defendant Eaton's executor has asked us to hold that R. L. c. 171, § 5,* provides only for cases where a sole plaintiff

---

* " Section 5. If the sole plaintiff or defendant in a personal action, the cause of which survives, dies before the entry thereof or of an appeal from a

or defendant dies before the entry of the action, or, in case of an appeal, before the entry of the appeal, leaving the case of death after the entry of the action or appeal unprovided for. His argument is that the second and third sentences of that section apply to the two cases covered by the first sentence, and to those two cases only.

If the construction of the section were dependent upon the interpretation of the wording used apart from other considerations, it may be conceded that the construction put forward by Eaton's executor would be the true construction of the section.

But there are other considerations. Without going through the history of the earlier acts it is enough to take them up as they were brought together in the Revised Statutes. It was there provided :

First. That in all personal actions in which the cause survives, if the sole plaintiff or defendant dies before entry of the action or of an appeal, or at any other time before final judgment, the action may be prosecuted by and against the administrator or executor as provided in that chapter. Rev. Sts. c. 93, § 1. This was necessary because at common law all actions abated on the death of the plaintiff or the defendant, whether the cause of action survived or not. *Mellen* v. *Baldwin*, 4 Mass. 480, 481. *Putnam* v. *Putnam*, 4 Pick. 139, 140, 141. *Green* v. *Watkins*, 6 Wheat. 260, 262. *Booth* v. *Northrop*, 27 Conn. 325, 328. *Carter* v. *Jennings*, 24 Ohio St. 182, 186.

Secondly. It was provided that the action or appeal might be entered if it had not been entered and the death of the party be suggested of record, and thereupon the administrator or executor might voluntarily appear and prosecute or defend the action. Rev. Sts. c. 93, § 2.

Thirdly. It was provided that in case the administrator or executor did not voluntarily appear a citation might be taken

---

judgment rendered therein, the action or appeal may be entered and his death suggested upon the record. After the entry of such action or appeal and of the suggestion of his death as aforesaid, his executor or administrator may, within such time as the court or trial justice allows, appear and prosecute or defend in the same manner as if the action had been commenced by or against him. If he does not voluntarily appear the court or trial justice before whom the action is pending shall, upon motion of the surviving party, cite him to appear and prosecute or defend it."

out against him, Rev. Sts. c. 93, § 3, and on his failing to appear a nonsuit or judgment by default might be entered against him. Rev. Sts. c. 93, §§ 4–6.

These sections were re-enacted in Gen. Sts. c. 127, §§ 5–10, and in Pub. Sts. c. 165, §§ 5–7 and 9–11.

The Commissioners of the Revised Laws reported the act as it now stands. From the marginal references in their report it appears that they intended to re-enact the earlier acts, and particularly that R. L. c. 171, § 5, was intended to be a re-enactment of Pub. Sts. c. 165, §§ 5, 6 and 7, which correspond to Rev. Sts. c. 93, §§ 1, 2 and 3.

The evident purpose of these commissioners in reporting a consolidation of existing law was to abbreviate as much as possible.

Reading R. L. c. 171, § 5, in the light of these facts, and of the further fact that the construction urged by this defendant would leave unprovided for the case which ordinarily occurs and which in case of the sole survivor of several plaintiffs and defendants is expressly provided for in R. L. c. 171, § 8, we are of opinion that the object of the first sentence of that section was to authorize the entry of the action or appeal in case the death occurred after the action was begun or the appeal claimed but before the entry thereof, and also to authorize the suggestion of the death on the record under those circumstances.

The second sentence provides that after the entry of an action the cause of which survives or of an appeal in such action, and after the entry of the suggestion of the death of a sole plaintiff or sole defendant " as aforesaid," (that is to say, upon the record of the court,) no matter when the death suggested occurred, his executor or administrator may voluntarily appear and prosecute or defend.

The third sentence provides for citing in an administrator or executor in all cases where he is authorized to appear and does not do so voluntarily.

The result is that in the case originally brought against Eaton the exceptions must be overruled, and, in all the cases, under the terms of the report the entry must be

*Case to stand for trial on the second count.*