## POSITYPE CORPORATION OF AMERICA v. FLOWERS.

Circuit Court of Appeals, Seventh Circuit. December 20, 1929.

Rehearing Denied January 29, 1930.

No. 4137.

Clyde E. Shorey, of Chicago, Ill., and R. R. Hicks, of New York City, for appellant.

Francis X. Busch, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellant brought this action to recover on an alleged stock subscription contract signed by appellee who defended on numerous grounds. At the close of the trial both parties moved for a directed verdict, and the court granted appellee's motion. From the judgment entered in accordance with this verdict, this appeal was taken.

A very similar case arose in the New York district court upon this same contract. An appeal was taken from the judgment entered in plaintiff's favor, and the opinion is reported in 32 F.(2d) 202. The statements of facts there appearing will be supplemented only so far as is necessary to present the new questions presented on this appeal.

Appellee defends on the ground that (a)

his subscription was conditional upon the solicitor's securing his two associates to sign with him for said $50,000; (b) the contract signed was an underwriting agreement and not a subscription contract; (c) it was effective only when responsible subscribers signed for a total of $1,000,000 of the preferred stock; (d) some of the other subscribers were not financially responsible, nor were their subscriptions taken in good faith; (e) plaintiff's motion for a directed verdict after defendant had moved for a directed verdict was equivalent to an agreement to waive the jury, and the court's finding cannot now be disturbed, in view of the conflict in the evidence; (f) the evidence respecting the condition of appellee's signature, the responsibility of other subscribers, and the good faith of the subscription was such as to present a jury question; (g) appellant afterwards violated the subscription agreement by granting unauthorized extensions of time within which certain acts were to be done, and appellee was thereby released from liability.

■ *Nature of the agreement.* Appellee argues that the agreement was not a subscription but an agreement to subscribe—"an agreement to do something in the future in the event of certain conditions"—and, when the agreement is read as a whole, it must be characterized as an underwriting agreement.[1]

He cites, among other cases, International Products Co. v. Vail's Estate, 97 Vt. 318, 123 A. 194; Busch v. Stromberg-Carlson Co. (C. C. A.) 217 F. 328; and Electric Welding Co. v. Prince, 195 Mass. 242, 81 N. E. 306, to support his views. But the agreements in these cases are distinguishable from the contract before us. The first paragraph in Flowers' contract created an unqualified obligation, not to take what was unsold to the public, but to pay the amount designated—in appellee's cases, $50,000. Moreover, paragraph 8 is significant. The agreement is not binding unless all the preferred stock (10,000 shares of first preferred) "shall have been underwritten *on this instrument* or on counterparts thereof on or before April 1st, 1921." The essential difference between a subscription contract and an underwriting agreement lies in the fact that in the latter the signers obligate themselves to take the shares which the public do not purchase. In the subscription agreement the signers agree absolutely to take the number of shares designated.

The argument that the signers "agreed to subscribe" rather than *subscribed* is not, in this case, particularly significant. The subscribers could not subscribe for the stock because the corporation was not in existence. They therefore merely "agreed to subscribe" for stock when the corporation was organ-

---

[1] Underwriting Syndicate Agreement.

(1) We, the undersigned, each for himself, in consideration of the premises, do hereby agree with each other and with the parties to a certain Agreement to Incorporate, attached hereto, to subscribe and pay for First Preferred Stock (8% cumulative of the par value of $100. per share), and Common stock (of no par value) of the Corporation to be formed according to the terms of said attached Agreement, in the amounts set opposite our respective signatures hereto, on the following terms and conditions:

(2) The price to the members of the Syndicate participating in this underwriting shall be $100. for each share of First Preferred which will carry with it 2 shares of Common stock, both classes to be fully paid and non-assessable.

(3) The times of payment shall be:

(4) Ten per cent. (10%) of one-half of the subscription amount on call of the directors of the corporation upon the closing of the public sale as hereinafter provided.

(5) The remaining ninety per cent. (90%) of said one-half of the subscription amount shall be paid upon call of the directors in nine (9) successive installments of ten per cent. (10%) each, but no installment shall be called less than thirty (30) days subsequent to the due date of the preceding installment. The other one-half of the subscription amount shall be payable on call of the directors at a date not less than

one month after the due date of the last ten per cent. (10%) installment.

(6) The Syndicate Manager may reject or reduce any subscription made hereunder. In the event of a smaller amount being allotted to a participant than the amount underwritten by him, such participant agrees to pay for such smaller amount on the same terms and conditions as above provided.

(7) The Syndicate Manager shall have power to enforce this agreement either by suit upon subscriptions or by forfeiture of all payments made by parties in default, and may deprive them of any right to participate in the benefits of this agreement.

(8) This agreement shall not be binding upon the undersigned unless at least ten thousand (10,000) shares of Preferred and twenty thousand (20,000) shares of Common stock shall have been underwritten on this instrument or on counterparts thereof on or before April 1st, 1921. The Syndicate Manager has authority to extend this date for a period not to exceed ninety (90) days. Immediately after the date of the said completion of this underwriting the Syndicate Manager shall notify each participant of that fact and of the amount of the participant's allotment hereunder.

(9) The Syndicate Manager is hereby authorized and directed to receive from the corporation, when and as if issued, the stock hereby underwritten, and to offer the same (except

ized. Not only was such agreement valid (Richelieu Hotel Co. v. Military Encampment Co., 140 Ill. 248, 29 N. E. 1044, 33 Am. St. Rep. 234; Yonkers Gazette Co. v. Taylor, 30 App. Div. 334, 51 N. Y. S. 969; Sanders v. Barnaby, 166 App. Div. 274, 151 N. Y. S. 580), but we see nothing in the wording that would militate against a holding that the instrument was a subscription agreement. An agreement to subscribe for corporate stock in a corporation about to be formed might be distinguished from a sub-

such as may have been withdrawn as hereinafter provided) for sale to the public on the following terms: The Preferred shall be offered at not less than $100. per share and not more than one (1) share of Common may be given with each share of Preferred so sold. The Syndicate Manager may make such sales to the public for cash in full or on the installment plan, provided that such installments shall be in amounts at least as large and that dates of payment be not further extended than as above provided for payment by the participants in this underwriting. No Common stock shall be offered for public sale except in conjunction with Preferred stock as above stated.

(10) Sales made by the Syndicate Manager shall reduce pro rata the respective liabilities of the several participants herein.

(11) Each underwriter shall have the option of withdrawing from public sale any of the stock underwritten and allotted to him, provided that such withdrawals shall be made in units of one (1) share of Preferred and two (2) shares of Common stock and shall be paid for at the underwriting price of $100. for each unit. Payment of stock so withdrawn may at the option of each underwriter be made in cash in full or in installments at the times and in the amounts above stated. This option to withdraw, unless further extended by the Syndicate Manager, shall expire one week before the public offer of sale is commenced. The Syndicate Manager shall notify each underwriter of the date of such expiration at least one week prior thereto. Such withdrawals shall operate to reduce, to the extent thereof, the liability hereunder of the participants so withdrawing. Stock withdrawn from public sale shall not be sold or offered for sale by the underwriters without the assent of the Syndicate Managers until after the conclusion of the public sale. Each underwriter shall be promptly notified by the Syndicate Manager of the date of such conclusion.

(12) The Underwriters shall not be liable for any of the expenses of the Syndicate. Such expenses shall be paid first from the profit that may be derived from public sale of stock at a price in excess of the subscription price hereunder. Any further expense of the Syndicate shall be borne by the corporation. If the expenses of the Syndicate should be less than the sum in the Syndicate Manager's hands representing profits on sale over and above subscription price, then such excess shall be distributed among the underwriters in proportion to the amount of the respective participations allotted to them.

(13) The date on which the public sale of stock by the Syndicate shall be concluded shall be fixed by the Syndicate Manager, but in no event shall this date be later than December 1st, 1921.

(14) After the complete performance of the obligation of the participant hereunder, such participant shall be entitled to receive stock then held by the syndicate manager for his account under this agreement, and also his ratable share, as above provided, of the profits of the Syndicate, if any.

(15) The underwriters and each of them hereby give authority to the Syndicate Manager to do any act necessary to effect the purpose and intent of the Agreement, but nothing shall be done contrary to the express terms of this Agreement, and no liability shall attach to the underwriters except the underwriting obligations as stated. The Syndicate Manager shall not be liable to the underwriters for their acts or omissions, unless due to their own several willful misconduct. They shall not be liable for the acts or omissions of bankers or brokers, or any other person, employed by them, provided they exercise reasonable care in the selection of such bankers or brokers or other persons.

(16) The obligations and benefits of this agreement shall run against and in favor of the personal representatives and successors of the parties hereto, and the death of any individual or the ceasing to exist of any corporation, being a party hereto, shall not work a dissolution of the Syndicate. It is expressly stated and agreed that the underwriters shall not be construed to be partners. The rights and obligations of a participant hereunder shall not be assigned without the assent in writing of the Syndicate Manager.

(17) Mr. Arthur J. Morris is hereby appointed Manager of the Syndicate composed of the participants herein.

| [Signed] Name. | Address. | Number of Shares Subscribed for. | | Amount Underwritten. |
|---|---|---|---|---|
| | | Preferred. | Common. | |
| H. G. Bulkley | Cleveland | 500 | 1,000 | $ 50,000.00 |
| Robert J. Bulkley | Cleveland | 500 | 1,000 | $ 50,000.00 |
| Jno. Markle | New York City | 1,000 | 2,000 | $100,000.00 |
| Herbert L. Satterlee | " " " | 500 | 1,000 | $ 50,000.00 |
| Wm. H. Ingersoll | " " " | 500 | 1,000 | $ 50,000.00 |
| Arthur J. Morris | " " " | 500 | 1,000 | $ 50,000.00 |
| Chas. M. Barnett | " " " | 500 | 1,000 | $ 50,000.00 |
| Huger W. Jervey | " " " | 500 | 1,000 | $ 50,000.00 |
| C. A. Bishop | " " " | 500 | 1,000 | $ 50,000.00 |
| John Lee Mahin | " " " | 500 | 1,000 | $ 50,000.00 |
| J. C. Flowers | " " " | 500 | 1,000 | $ 50,000.00 |

scription for stock in an existing company, in that the former, in some instances, might require action upon the part of the corporation formed, but there is no difference in the two agreements so far as absolute liability is concerned.

It is undoubtedly true that this subscription contract also contained certain provisions which were usual in syndicate agreements. We see no reason why the parties could not embody in one instrument different kinds of agreements such as are here included. The only purpose of our inquiry into the other provisions is to ascertain whether they throw light upon or affect the character (subscription or underwriting) of this instrument.

To illustrate—a deed absolute in form may be in fact a mortgage. A bill of sale, so termed and in form, may be a chattel mortgage. The name by which the agreement is called is quite immaterial. The syndicate agreement might have contemplated a resale of all or a large part of the stock before the first call on the subscription price was made. In this case there was no doubt the hope, if not the expectation, in the breast of all the subscribers, that all the preferred stock would be resold. But the agreement cannot be construed on the basis of the hopes of the parties entering into the contract. There was no dependent or conditional relation between the subscription agreement and the successful execution of the syndicate plan, disclosed. The subscription was definite, absolute, and unqualified. It was complete without reference to the syndicate provisions. Nor is there an essential provision of the syndicate agreement which in any respect impairs, qualifies, or lessens the effect of the subscription agreement. There is one section at least (paragraph 11) which confirms the absolute and unqualified character of the subscription agreement. In this paragraph the subscriber's right to withdraw his stock from sale by the syndicate manager is a recognition that the signer of the subscription agreement at all times had the right to demand the stock in the amount by him subscribed. If his right to the shares of stock by him subscribed was absolute, how could his obligation to pay for the stock be less restricted?

While not specifically discussed in the opinion, this likewise was the conclusion reached in the Mahin Case.

■ *Evidence.* Evidence was received over appellant's objection, to the effect that Flowers signed the instrument upon the express understanding and condition that, unless Gerlach and Bigelow (two of his associates) came into the deal and each agreed to assume one-third of the obligation, he was not bound thereby. Other written evidence was received which indicated that Flowers understood his obligation was limited to one-third of his subscription, and that his two associates were to be solicited for the balance of the $50,000 for which he signed.

Much space is devoted to the discussion of the admissibility of this evidence. The view we take of the question does not require any consideration of its admissibility as between the signer and the subscription solicitor or the parties by him represented. It appears from the record before us that the subscriptions were each made on the basis of the other's action and all upon the condition that a total of $1,000,000 of subscriptions be secured. It likewise appears that others did sign the subscription, and that only a few at the most knew that Flowers had placed conditions upon his subscription not embodied in the written instrument; that on the basis of his and other apparently unqualified and unconditional subscriptions the intended corporation was formed, large sums of money were paid into the treasury of such corporation, and the assets of the other corporation were transferred to the new one.

Flowers did nothing to notify the other subscribers of his conditional subscription, but permitted it to be used to secure additional subscriptions, to induce the formation of the new company and the transfer of the assets of the existing corporation to the new one. Under these circumstances he is estopped to now assert that his subscription, absolute on its face, was nevertheless conditional, and that the condition had not been complied with. Fletcher on Corp. vol. 2, p. 1308; Minneapolis Threshing Machine Co. v. Davis, 40 Minn. 110, 41 N. W. 1026, 3 L. R. A. 796, 12 Am. St. Rep. 701.

■ *Bona fide character of other subscriptions.* On this aspect of the case appellee argues that he is not bound by his subscription because some of the other subscribers, whose subscriptions made up the total of $1,000,000, were not financially responsible, and, moreover, the subscriptions in such cases were not taken in good faith, but were merely to make a paper showing of $1,000,000 of closed subscriptions. This same contention was strongly urged, but without success, in the Mahin Case (C. C. A.) 32 F.(2d) 202, 205, where the court reached the conclusion that the evidence was insufficient to present a jury question as to this issue.

Without further discussion, we adopt the conclusion there expressed that the subscription contract alone defined the agreement of the parties, and that the language appearing in the agreement between the old corporation and the incorporators of the new corporation cannot be considered in determining the rights of the parties to the subscription contract. But we agree with appellee that the language of the subscription contract alone, to the effect that "this agreement shall not be binding upon the undersigned unless at least ten thousand (10,000) shares of Preferred and twenty thousand (20,000) shares of Common stock shall have been underwritten on this instrument or on counterparts thereof on or before April 1st, 1921," called for bona fide subscriptions by *solvent persons apparently able to pay* their subscriptions. Thompson on Corporations (3d Ed.) vol. 1, § 603. In the Mahin Case the testimony was considered and the court concluded: "The charge of bad faith on the part of the promoters finds no support in the record. Moreover, it is difficult to understand why the charge is made. Good faith of the promoters is shown beyond dispute." The evidence in the instant case on this issue is not essentially different from that in the Mahin Case. ▆ But counsel argue that, inasmuch as this was a law action and the evidence was not entirely free from controversy, the jury would have been required to pass on this issue but for the action of both counsel in moving for a directed verdict. While such motions for directed verdicts as here made are equivalent to an agreement to waive a jury trial, it is by no means clear that the evidence was controverted. The oral pronouncement of the District Judge shows rather clearly that he did not place his decision upon this ground. No mention of this issue was by him made in his statement disposing of the case. True, it may be inferred that this issue was likewise found against the appellee, and this inference necessitates a study of the record to ascertain whether there was any evidence to support a finding that the subscribers were insolvent or unable to pay their subscriptions, or that the subscriptions were not taken in good faith. If there existed any evidence of this character, the judgment must stand because of plaintiff's counsel's motion for a directed verdict without qualification after defendant's counsel had made a similar unqualified motion.

▆ We find no evidence that would support a finding by the trier of the fact, whether judge or jury, that the subscriptions were not taken in good faith.

Neither can it be said that a scintilla of evidence pointed to the insolvency of any subscriber. Hundreds of thousands of dollars were paid on the subscriptions, and of only four at the outside could it be argued that they were apparently unable to pay their subscriptions.

Concerning one of these subscribers, H., it appears that he was in default on a $50,000 subscription to the stock of another enterprise. When the solicitor's attention was called to this fact, it is asserted that he replied, "That don't make any difference anyhow. I want to get this thing completed. Nobody will ever be called upon anyhow because they won't be asked to pay it." This last statement is used as the basis of the argument that H.'s subscription was not taken in good faith. Rather do we think the observation supports the solicitor's great faith in the success of the enterprise. Because he believed this preferred stock and part of the common stock would be shortly sold under the syndicate agreement, and for a profit to the subscribers, affords no proof that H.'s subscription was not enforceable. From all that we can gather from this record, H. might have had good grounds for not paying his subscription to the stock of the other company. Or he may have had an extension of time in which to pay it. There is not a scintilla of evidence to show that he was either financially unable to meet the subscription to appellant's stock, or, for that matter, that he did not meet it fully and promptly.

As to another subscription for $50,000, the subscriber testified that, at the date he signed, he had a residence worth $25,000 or $30,000 with a $6,000 mortgage on it, $8,000 or $10,000 of cash or Liberty bonds and drew a salary of $30,000 a year. He was a partner in the Robert H. Ingersoll & Bros. Company, makers of the Ingersoll watch. He was in the employ of a large and prosperous corporation and had a substantial income. He subsequently became the president of appellant company. It does not appear whether he actually paid his subscription or not. As to this subscription, surely there was no doubt or controversy as to his solvency or his apparent ability to pay his subscription when, and as, it became due. The good faith of these subscriptions and the subscribers' apparent ability to pay should be determined as of the date of the subscriptions rather than later when financial positions may have been disturbed or completely upset by a

financial panic such as occurred shortly after this enterprise was born.

It should be borne in mind that this preferred stock was of real worth and its sale, if necessary, was a privilege open to the subscribers.

Another subscriber was Hosick Crawford & Co., an Illinois copartnership, engaged in the flotations of stock such as appellant's. The firm had been in business for five years and were Illinois licensed to sell stock. A financial statement contemporaneously given showed the firm to be solvent with approximately $27,000 of net assets. Crawford testified that he had no assets other than his interest in the partnership, but did not "know anything about his partner's private affairs." This firm undoubtedly made the subscription with the expectation that it would sell the stock of the company, retaining part of the common stock for its services or for its profit. It was organized and conducted for such purpose, and there is little or nothing to suggest its inability to pay for its stock in the installments provided for through the sale of this stock and from the profits of its business.

A fourth subscriber was engaged in the advertising business in New York, and he signed his subscription apparently on the assumption that he would get a goodly amount of advertising business from the profits of which he would pay his subscription. This subscriber was one Mahin, the appellant in the New York case. Concerning his earning capacity and position he testified: "I have been in the advertising business practically all my life. I was with the Chicago Daily News a few months in 1893. * * * Later on I organized the Mahin Advertising Corporation. * * * I came to New York in 1916. I sold my 51% in the Mahin Advertising Company in 1917. My salary as President of that company was never over $12,000 a year. * * * I became director with the Federal Advertising Agency. I received no salary from that company but I received one-third of the gross receipts on the business that I brought in. I continued with the Federal Agency until the first of December, 1925. I am receiving a very substantial salary. A brokerage house in 1921 or 1922 asked for collateral and I was cleaned out. I cannot give you a list of the stocks that I owned at that time. I had a substantial amount of insurance, around $100,000."

It does not appear whether the witness received any commission from the advertising company or not. In a general way it does appear that very large sums were to be expended in advertising, and the company to be formed needed the advice and services of one with a large experience in advertising.

When he testified, this witness was defending an action brought against him on his subscription. He apparently was the only subscriber whose ability to pay could in any wise be questioned. And, as to him, the doubt arises largely over his unwillingness rather than his inability to pay. His reluctance to meet his obligation hardly rises to the dignity of evidence that would justify a jury in saying his subscription was not taken in good faith or without expectation that it would be paid according to its terms when his earning capacity and admitted solvency is considered.

In short, considering all of the evidence, we conclude that a verdict in favor of the appellee on this issue would never have been permitted to stand.

Appellee further contends that his liability terminated because of a breach of the thirteenth paragraph which provided that: "The date on which the public sale of stock by the Syndicate shall be concluded shall be fixed by the Syndicate manager, *but in no event shall this date be later than December 1st, 1921.*"

All of the subscribers (including appellee) agreed to an extension of this date, but in appellee's consent there was inserted by him a written statement, after the figures denoting the amount of his subscription, these words: "Less the amount originally intended to be taken by Mr. Bigelow and Mr. Gerlach."

As before pointed out, the document containing the subscription agreement also contained a syndicate agreement wherein the subscribers appointed a syndicate manager who was authorized to sell one share of preferred stock and one share of common stock for the price which the subscriber paid for one share of the preferred stock and two shares of common stock. In the provision of the syndicate agreement giving the syndicate manager authority to sell the stock as above set forth it was provided that the manager should fix a date (not later than December 1, 1921) and give notice thereof to the subscribers who, in turn, had the right to withdraw from such sale any of the stock by them subscribed.

A fair construction of the agreement signed and sent in by appellee, with the interlineations added, necessitates our holding that appellee consented to the extension of

time in which the syndicate manager might make the sale (a provision which was for his benefit) and at the same time expressed appellee's intention to limit his liability to one-third of $50,000.

A construction which grants an extension of time is not inconsistent with the signer's expressed statement that his liability is restricted to one-third of $50,000. Moreover, the date fixed within which the public sale was to take place was not a condition of the subscription. Rather should it be said that appellee's right to withdraw his stock from such public sale was a ratification of his subscription. Likewise it is apparent that the extension of time within which the sale might be made was, in view of the option given to the subscriber to withdraw his stock (paragraph 11), a provision for the benefit of the subscriber.

The judgment is reversed, and the cause remanded.