INTERNATIONAL PRODUCTS COMPANY *v.* ESTATE OF THEODORE N. VAIL.

February Term, 1923.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed January 7, 1924.

*Conclusiveness of Judgment—Corporations—Characterization of Agreement Concerning Stock by Parties Not Conclusive as to Its Nature—Underwriting Agreement—Harmless Error —Status of Contract to Issue Stock for Financial Aid— Illegal Underwriting Contract May Not Be Validated by Subsequent Legislation—Unlawful Contract for Bonus Stock Not Validated by Underwriters Taking Entire Subscription —Effect of Several Considerations for One Promise, Some Legal and Some Illegal.*

1. In the Supreme Court on exceptions to the judgment of a county court in an appeal thereto from an order of probate court disallowing a claim against an estate, if the judgment is supported by unchallenged findings which are based on evidence not excepted to, the judgment must stand, unless findings which the court erroneously failed to make, subject to exception, necessitate a reversal.

2. While the characterization of an agreement concerning corporate stock by the parties may properly be considered in determining their true intent, as well as the fact that such parties were men of experience in large business operations and presumably knew the meaning of the language which they used, the nature of the instrument is not to be determined alone by what the parties called it, nor is the signers' liability to be determined by the fact that they are styled "underwriters."

3. An instrument relating to corporate stock *held* to be an underwriting agreement, and not a subscription for stock.

4. An underwriting contract, aside from its use in insurance, is an agreement, made before corporate shares are brought before . the public, that in the event of the public's not taking all of the shares, or the number mentioned in the agreement, the

underwriter will take the shares which the public does not take; a definition which applies also to the underwriting of corporate bonds, underwriting being a purchase, together with a guaranty of a sale of the stocks or bonds.

5. Where the signers of a contract agreed, in consideration of a stipulated underwriting commission, to take such of the 10,000 shares of preferred and 9,000 shares of common stock as were not sold to other parties before a certain date, at an agreed price for 1 share of preferred and 9/10ths share of common stock, the agreement was an underwriting contract.

6. In a case tried by a court without a jury, where the trial court reached a correct result in its construction of an underwriting agreement, it does not matter whether the question was treated by the court as one of fact or one of law.

7. Under the law of Maryland, a corporation cannot issue its stock in return for mere financial aid, whether the stock is issued as a bonus, or in payment for services.

8. Where an underwriting agreement was made in violation of such law, by the giving of a bonus of common stock to the subscribers, being illegal when made, it could not be validated by a law subsequently enacted.

9. Though none of the stock was issued to the public under such agreement, but all of it was taken by the subscribers to the underwriting agreement, except the defendant who was being sued thereunder, the contract was not thereby made valid, the effect being precisely the same as if the underwritten stock had been sold to the public, and the bonus stock had been issued to the subscribers in payment of the agreed underwriting commission.

10. Where an underwriting agreement of a Maryland corporation, provided for a bonus in stock to the subscribers to such agreement, contrary to the law of such state, and all the stock was issued to the subscribers except the one sued thereon, as the bonus stock formed a part of the consideration for the signers' undertaking, the agreement was wholly void, under the rule that where there are several considerations for one promise, some legal and others illegal, the promise is wholly void, it being impossible to say which consideration induced the promise; and in an action against a subscriber under the contract such illegality could be relied upon as a defense.

APPEAL from an order of the probate court for the district of Caledonia disallowing the claim of the International Products Company against the Estate of Theodore N. Vail. , Trial by court at the June Term, 1921, *Wilson, J.,* presiding. Judgment for the defendant. The plaintiff excepted. The opinion states the case. *Affirmed.*

*Fred E. Gleason (White & Case* of counsel) for the plaintiff.

*W. B. C. Stickney* and *Edwin W. Lawrence (Nathaniel T. Guernsey* and *Neal M. Monroe* of counsel) for the defendant.

SLACK, J.    This is an appeal to the Caledonia county court from an order of the probate court for the district of Caledonia disallowing the plaintiff's claim against the estate of the late Theodore N. Vail. The case was heard below by the court, and on the facts found, judgment was rendered for the defendants, and the case is here on plaintiff's exceptions. These exceptions are to the admission of evidence, to the findings of the court, to the failure of the court to find as requested, and to the judgment.

[1]    If the judgment is supported by unchallenged findings which are based upon evidence not excepted to, it must stand, unless findings which the court erroneously failed to make, subject to exceptions, necessitate a reversal. We first examine, therefore, the claims of the respective parties concerning some of the findings that are not challenged.

The plaintiff is a Maryland corporation. Under date of October 20, 1919, Mr. Vail, with several other individuals, entered into an agreement in writing with the plaintiff, which agreement is as follows:

"The International Products Company

. Underwriting Agreement            October 20, 1919.

For valuable consideration, the undersigned, each for himself and his legal representatives but not for any of the others hereby, binds himself to each of the others and to the International Products Company to the underwriting of the number of shares set opposite his signature of a total lot of 10,000 shares of the Preferred Stock of the par value of $100 each and 9,000 shares of the Common Stock without nominal or par value of the International Products Company proposed to be sold by it before

September 1, 1920, the price of said underwriting to be $113.75 in the aggregate for each share of said Preferred Stock and 9-10 of one share of Common Stock so underwritten, with the right, however, to the Company to otherwise dispose of all or any part of said Preferred and Common Stock at private sale or at public offering at any time before September 1, 1920, upon the understanding, however, that in any event an underwriting commission of 1-10 of one share of Common Stock for each share of Preferred and each 9-10 of one share of Common Stock hereby underwritten by the undersigned shall be payable to him by the Company and that to the extent of said Preferred and Common Stock that may be so otherwise disposed of by the Company, the underwriters shall be relieved of their underwritings pro rata in the proportion to which the amounts of their respective underwritings bear to the total amounts underwritten and that they shall therefore be called upon to take only such portion of the 10,000 shares of Preferred and 9,000 shares of Common Stock, if any, as may not be so otherwise disposed of, as the amounts of their respective underwritings bear to the total amount underwritten; payment for the shares of Preferred and Common Stock hereby underwritten by the undersigned shall be made by him in cash as called for by the Company on 30 days' prior notice in writing duly given at any time during the month of September, 1920, provided, however, that in lieu of certificates for the appropriate amounts of said Preferred Stock deliverable to the underwriters hereunder, the Company may at its option deliver scrip equal in amount to the par value of said Preferred Stock in appropriate amounts, bearing interest at the dividend rate thereof until the next succeeding dividend payment date, and at that time exchangeable for certificates for Preferred Stock; this underwriting agreement is contingent and contingent only upon an underwriting being obtained hereunder as to the entire 10,000 shares of Preferred Stock and 9,000 shares of Common Stock and upon appropriate proceedings being taken on behalf of the Company to effect an increase of its authorized Capital Stock to the extent at least of said 10,000 shares of Preferred and 10,000 of Common Stock and due authorization of the issue and sale of said Preferred and Common Stock in accordance with the terms hereof, the undersigned hereby agreeing to cooperate to accomplish such increase and issue and sale of stock in every way possible, through affirmative vote, waiver of notice, consent or otherwise in respect of stock already owned by him.''

This instrument was signed by Mr. Vail and the other individuals. Opposite the signature of Mr. Vail, and each of three

other signers, was set 1,700 shares of preferred stock and 1,530 shares of common stock; opposite the names of two signers who were treated as a single signer, was set a like number of shares of preferred and common stock, and opposite the signature of one signer was set 1,500 shares of preferred and 1,350 shares of common stock.

Mr. Vail never received or paid for any of this stock; the other subscribers received and paid for the number of shares set opposite their respective names, under an arrangement with the plaintiff which need not be noticed here. Mr. Vail died April 16, 1920, before the steps necessary to authorize the increase were completed.

[2]    The first question for consideration is whether this agreement is in effect a contract of subscription for capital stock of the plaintiff, as the plaintiff claims; or an underwriting agreement of such stock, as is claimed by the defendants. As the case is presented, this question must be determined, solely, from the instrument itself. If the parties' characterization of it, or of the signers and their undertaking, as appears from the instrument itself, was determinative of this question, it would be easily solved. They call it an "Underwriting Agreement." The signers agree to the "underwriting" of the number of shares set opposite their respective names. The price of said "underwriting" is agreed upon, as well as the "underwriting commission." The company had the right, it will be observed, to sell the same stock to other parties, at private sale or at public offering, at any time before September 1, 1920, and to the extent that it did sell such stock to others, the "underwriters" were relieved of their "underwritings" pro rata in the proportion to which the amounts of their respective "underwritings" bore to the total amounts "underwritten," etc. But the nature of the instrument is not to be determined, alone, by what the parties called it, nor is the signers' liability to be determined by the fact that they are styled *underwriters*, although, in attempting to ascertain the true intent of the parties, which is the "pole star" in construing all contracts, these characterizations may properly be considered. And in considering them, it should be borne in mind, too, that the men who used them (the signers of this instrument) were men of experience in large business operations, as may fairly be inferred from the nature and magnitude of the

undertaking evidenced by the instrument, and presumably knew the meaning of the language which they used to express their agreement.

[3-5]   But aside from this, a careful study of the instrument convinces us that it is an underwriting agreement, and not a subscription for stock.   An underwriting contract, aside from its use in insurance, is an agreement, made before corporate shares are brought before the public, that in the event of the public's not taking all of the shares, or the number mentioned in the agreement, the underwriter will take the shares which the public does not take; a definition which applies also to the underwriting of corporate bonds, underwriting being a purchase, together with a guaranty of a sale of the stock or bonds.   14 C. J. 553; Machen Modern Law of Corp., §§ 416, 417; 1 Fletcher Cyc. Corp., § 442; *Busch* v. *Stromberg-Carlson Mfg. Co.*, 217 Fed. 328, 133 C. C. A. 244; *Fraser* v. *Home Tel. & Tel. Co. et al.*, 91 Wash. 253, 157 Pac. 692.   Such is the contract before us.   In effect, the signers agreed, in consideration of the stipulated underwriting commission, to take such of the 10,000 of preferred and 9,000 shares of common stock as were not sold to other parties before September 1, 1920, at an agreed price for 1 share of preferred and 9-10 share of common.   The plaintiff was thus assured of a definite amount for this stock in any event, which is one of the main objects of an underwriting agreement.   But, by its reserved right to sell to others, it retained absolute control of the stock for several months; if, in the meantime, the price advanced above the signers' offer, the plaintiff had the benefit thereof, if the price fell below that offer, the plaintiff could look to the signers for the agreed price.   In this situation, there should seem to be no doubt as to the nature of the agreement.

[6]   The defendants contend that the agreement is invalid, and consequently unenforceable, because at the time it was made the plaintiff was forbidden, by the law of Maryland, to issue its stock in payment of an underwriting commission; and the trial court found such to be the fact on the testimony of one Carter, a witness called by the defendant.   The plaintiff excepted to this finding, and also the admission of Carter's evidence on which the finding is based.   Since the statutes of Maryland upon which this instrument must stand or fall, and the decisions of the court of that state relied upon by the respective parties, are in evidence,

we do not pause to consider the merits of these exceptions, but proceed to inquire whether the result reached by the trial court was correct, because if it was, since the case was tried by the court, it matters not, so far as the result is concerned, that the court adopted Carter's construction of the law rather than its own, or that it treated the question as one of fact instead of one of law; in other words, if that court would necessarily have reached the same result if it had treated the construction and effect of the statutes and decisions as a question of law for the court instead of a question of fact, as very likely it should have done, in the circumstances, *Tarbell* v. *Grand Trunk Ry. Co.*, 96 Vt. 170, 118 Atl. 484, and the cases there cited, although we do not decide this question, reversible error does not appear.

[7]    Section 35 of Art. 23 of the Code of Maryland, 1912, as amended in 1916 (Laws 1916, Ch. 596), which was the statute in force when this agreement was made, provided: "Any corporation of this state may dispose of its capital stock at such prices and for such considerations in money, in services rendered to or adopted by the corporation, or in property of any description suitable for the purposes of the corporation, or any of them as it sees fit. * * * * * Stock shall not be issued for less than par or for services or property, except in the manner following." Then follows certain specific requirements necessary to be complied with by the directors, the stockholders, and certain corporate officials before stock can be issued for less than par, or in payment for services or property. It is not found, nor is it claimed, that these requirements, or any of them, were complied with in the instant case.

In *Hopper et al.* v. *Brodie,* 134 Md. 290, 106 Atl. 700, decided in 1919, it was held that the holders of stock which was issued to them as a bonus for a loan to the corporation were liable for the price thereof, the court citing in support of its holding, *Richardson* v. *Green,* 133 U. S. 30, 33 L. ed. 516, 18 Sup. Ct. 280, and *Hughes* v. *Hall,* 117 Md. 547, 83 Atl. 1023, Id. 119 Md. 487, 87 Atl. 387. The statute in force when the agreement there involved was made (section 35, Art. 23 of the Code of 1912) although different in phraseology, was the same in effect, so far as material to our inquiry, as the statute in force when the agreement before us was entered into. In the course of its opinion, the court said: "It is evident that the provisions of our statute

do not contemplate the issuing of stock for anything except its value in money, property or services." And in construing the word "services" as there used, the court said: "In one sense anything which promotes the interest of another, and any benefit is a service, and in that sense Messrs. Spencer and Hopper * * * * may have rendered the company a valuable service. But that evidently is not the sense in which the word 'services' is used in the statute." It is apparent from this decision that under the law of Maryland, a corporation cannot issue its stock in return for mere financial aid, whether the stock is issued as a bonus, or in payment for services.

But the plaintiff, in the instant case, denies that the 1,000 shares of stock which the signers to this agreement were to receive as an "underwriting commission," 170 shares of which were to go to Mr. Vail, were to be issued or paid to the signers for services. One naturally inquires, for what, then, were they to be issued? Certainly they were not to be issued for property; nor for money, if the terms of the agreement are to be regarded.

The first contention of the plaintiff is, that "the subscriptions were for preferred and common stock at $113.75 for a share of preferred and 9-10 share of common," and that this was legal under section 35 of the Code. But the language quoted does not correctly state the agreement made by the parties. It omits, entirely, the very element which the defendants claim vitiates the agreement, namely, that the consideration for the signers' obligation was, in part at least, the agreement by the company to give them a certain number of its shares of common stock as an underwriting commission, which was forbidden by the law of Maryland.

[8] The plaintiff next claims that its agreement was to *pay* and not to *issue* 1-10 share of its common stock as an underwriting commission, and that under the authority conferred upon corporations by section 36-a of the Code, in force after June 1, 1920, to acquire and dispose of their own stock, etc., it could pay such commission with its stock acquired from others by gift or purchase. But if the agreement was illegal when made, it could not be validated by the subsequent enactment. *Schaun* v. *Brandt*, 116 Md. 560, 82 Atl. 551. That was a suit brought against the surety on a bond which was given to secure the performance by the United States Land Company of its agreement to purchase

from the plaintiff 100 shares of its own stock and to pay therefor an agreed price within a specified time. It was conceded that at the time the agreement to purchase was made, a corporation had no power to contract for the purchase of its own stock, but it was claimed that such power was thereafter conferred by the Legislature. Speaking of the effect of the later enactment, the court said: "If the law in force in 1908 did not give the Company the power to purchase its stock, and the contract was therefore, illegal, the act of 1909 did not change the character of that contract." In support of this doctrine, the court cites *Stewart* v. *Thayer,* 168 Mass. 519, 47 N. E. 420, 60 A. S. R. 407, and 9 Cyc. 576. Moreover, it is not even claimed that the plaintiff ever had any stock acquired under the power conferred by section 36-a with which it could have paid said commission. On the contrary, it appears from the elaborate "stock history" contained in the plaintiff's brief that of the stock authorized and issued pursuant to this agreement there was at the time of the trial below "Unissued T. N. Vail" 1,700 shares of the common stock, which included the 170 shares which he was to have for an underwriting commission.

[9]    The plaintiff calls attention to the fact that none of this stock was issued to the public but that all of it, except the Vail block, was taken by the subscribers. It does not suggest, however, nor is it apparent, how this affects the situation. If such stock was issued to the subscribers, *under this agreement,* 1-10 of every share of common stock issued was, in effect, a bonus, and was issued in violation of law. The effect was precisely the same as it would have been if the underwritten stock had been sold to the public, and the bonus stock had been issued to the subscribers in payment of the agreed underwriting commission.

[10]    We need not take the time or space to discuss other claims made by the plaintiff concerning the validity of this contract, since from whatever angle we view the situation we are confronted by the fact that the plaintiff was to receive no return in money, property, or services, the only things for which it could legally issue its stock under the laws of Maryland as construed in *Hopper et al.* v. *Brodie,* for the 1,000 shares of its common stock which it was to deliver to the signers of this instrument, under the terms thereof. This was as much a gratuity, or

bonus, as was the stock involved in the case last cited. The plaintiff is in the awkward position of suing upon an agreement which cannot be fully performed on its part except by issuing its stock upon terms forbidden by law. Such, in effect, was the situation presented in *Trent Import Co.* v. *Wheelwright,* 118 Md. 249, 84 Atl. 543, a case which involved the right of the plaintiff to collect for shares of stock which it had agreed to issue in violation of the laws of New York, where the plaintiff was incorporated. The court said: "The specific question is whether the plaintiff corporation can legally issue to the defendant common stock for which no money has been or will be received by it from any source, and which represents no return to the company in property or labor equal, in fact, to the par value of the stock, or so estimated in good faith by the directors. We think it clear that such an issue of stock to the defendant cannot be made by the corporation without a violation of the law to which it is subject." And a recovery was denied. There, as here, the attempt was to enforce an *executory* contract which the plaintiff could not perform on its part without doing what the law forbade. That the prohibition in the instant case extends only to the stock to be issued as an underwriting commission does not affect the result. That stock, manifestly, formed a part, at least, of the consideration for the signers' undertaking, and that being so, the agreement is wholly void under the rule stated in 13 C. J. 513 that, "If there are several considerations for one promise, some of which are legal and others illegal, the promise is wholly void, as it is impossible to say which part or which one of the considerations induced the promise." See, also, *Trent Import Co.* v. *Wheelwright, supra.* Whether, and to what extent if at all, the defendants would have been liable to the plaintiff, or to its creditors, if Mr. Vail had received this stock, we need not inquire; because, as already observed, we are dealing with an *executory* contract, not with an *executed* contract. And the rule stated in Clark & Marshall on Private Corporations, p. 1235 is that, "So long as an *ultra vires* or illegal contract for the issue of watered stock is executory the corporation cannot enforce it against the subscribers or purchasers, either by a suit in equity or by an action at law, for no action will lie to enforce an executory *ultra vires* or illegal contract." *Clarke* v. *Lincoln Lumber Co.,* 59 Wis. 655, 18 N. W. 492; *Rogers* v. *Gross,* 67

Minn. 224, 69 N. W. .894; *Trent Import Co.* v. *Wheelwright, supra.*

There can be no doubt as to the right of a defendant in an action of this kind to show the illegality of the contract upon which he is sought to be charged with liability, and in our opinion the defense upon that ground must prevail in this case. This makes it unnecessary to consider other questions raised by the exceptions.

*Judgment affirmed. To be certified to the probate court.*